**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**George Steven MAYES,
Defendant-Appellant.**

**No. 81–1199.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Oct. 5, 1981.

Decided Feb. 24, 1982.

Warren Williamson, Asst. Federal Public Defender, San Diego, Cal., for defendant-appellant.

Raymond Coughlin, Jr., Larry P. Zoglin, Asst. U.S. Attys., argued; M. James Lorenz, U.S. Atty., Raymond J. Coughlin, Jr., Larry P. Zoglin, Asst. U.S. Attys., on the brief, San Diego, Cal., for plaintiff-appellee.

Before SNEED, TANG, and PREGERSON, Circuit Judges.

PREGERSON, Circuit Judge:

Appellant George S. Mayes, a serviceman at the Camp Pendleton Marine Corps Base, Oceanside, California, appeals his conviction on one count of involuntary manslaughter under 18 U.S.C. § 1111 for the asphyxiation death of his ten-month-old daughter. Mayes contends that the trial court improperly denied his motion to suppress evidence that he asserts was seized pursuant to an illegal warrantless search of his on-base apartment. The trial court found 1) that exigent circumstances justified the search; 2) that the search conducted by a navy corpsman was a private, non-governmental search, and therefore not subject to the warrant requirement; and 3) that Mayes, who was about to vacate a virtually empty apartment, no longer had any reasonable expectation of privacy in the dwelling unit.

Additionally, Mayes charges that his indictment should have been dismissed because an expert medical witness on child abuse examined secret grand jury materials prior to testifying before the grand jury, and because less than twelve grand jurors heard all the evidence presented during six separate grand jury proceedings. Appellate jurisdiction is based on 28 U.S.C. § 1291. We affirm.

FACTS

On May 17, 1979, appellant George S. Mayes, then a Sergeant in the Marine Corps, was making final preparations to move out of the government-owned apartment he occupied with his wife and two children at Camp Pendleton. At 10:00 a. m. on May 17, the assistant manager of the apartment complex, Donna Gier, inspected Mayes's apartment. All furniture, household items, and personal effects had been removed. Gier instructed Mayes that the apartment needed additional cleaning and made arrangements to return at 2:00 p. m. for final inspection.

At approximately 2:00 p. m., Mayes telephoned the emergency room at the Naval Regional Medical Center and reported that his infant daughter was not breathing. Camp Pendleton Fire Department Engineer Frank Blair responded to the call and, after entering Mayes's apartment, attempted to revive the child. From the infant's throat, Blair extracted a wad of tissue paper two inches long and one and one half inches wide. Navy Hospital Corpsman Dennis Wright, who arrived soon after Blair, administered mouth-to-mouth resuscitation.

The child was rushed by ambulance to the Naval Hospital emergency room. There Lt. Comdr. Colletti, the attending chief pediatrician, administered emergency treatment. Dr. Colletti succeeded in stabilizing the child's condition, though it remained "extremely critical." About ten minutes after the child entered the hospital, Dr. Colletti instructed Corpsman Wright to return to the Mayes apartment and retrieve the object that had been removed from the child's throat. Dr. Colletti wished to examine the article to determine its role in the child's injury and to explore the possibility of child abuse.

Wright asked Mayes and his wife, who were in the hospital's waiting room, for the key to their apartment so that Wright could pick up some things he had left there. He went to the apartment, unlocked the door, picked up the wad of tissue paper from the living room floor, and returned to the hospital. The child never regained consciousness and died at approximately 3:00 a. m. the following morning.

Evidence relating to the circumstances of the child's death was presented to a federal grand jury. The grand jury heard evidence on six occasions from the end of May through the beginning of July 1980 to decide if an indictment should be returned charging Mayes with criminal conduct. On every occasion a quorum of sixteen grand jurors was present. Eleven jurors attended all sessions and there were no unexcused absences.

Prior to testifying before the grand jury, Dr. David Chadwick, a medical expert who had devoted twenty years of his practice to child abuse cases, reviewed the transcripts of all prior grand jury witnesses and examined other evidence presented to the grand jury. Chief Judge Schwartz of the Southern District of California ordered disclosure of these materials pursuant to an *ex parte* Fed.R.Crim.P. 6(e)(3)(C)(i) motion by the Government. Dr. Chadwick later testified that, in his opinion as an expert on child abuse, the child's death had not been accidental but that the wad of tissue paper had been placed deliberately in the child's throat.

## DISCUSSION

The basic purpose of the Fourth Amendment's prohibition against unreasonable searches and seizures is to safeguard the privacy and security of individuals against arbitrary invasions by governmental officials. *Camara v. Municipal Court*, 387 U.S. 523, 528, 87 S.Ct. 1727, 1730, 18 L.Ed.2d 930 (1967). Mayes argues that when Corpsman Wright returned to the apartment and retrieved the object that had obstructed the child's breathing passage, he engaged in an unreasonable warrantless search in violation of the Fourth Amendment.

The Fourth Amendment does not bar governmental officials from making warrantless searches and seizures in circumstances where they reasonably believe that a search is required to deal with a life-threatening emergency. *See Mincey v. Arizona*, 437 U.S. 385, 393, 98 S.Ct. 2408, 2413, 57 L.Ed.2d 290 (1978). As Mayes's daughter lay gravely ill, stable but still in "extremely critical" condition, the attending physician, Dr. Colletti, felt that it was imperative to examine the object that had caused the child's injury. The doctor was concerned that fragments of the object might have entered the child's lungs, necessitating surgery within the hour. The fact that he also suspected the possibility of criminal conduct does not detract from the emergency.

In such circumstances, it would be unreasonable to require the doctor to apply to a magistrate for a search warrant. In life-threatening situations minutes and seconds are precious. We conclude that the critical condition of Mayes's daughter constituted an exigency of sufficient proportions as to render the warrantless entry of Mayes's apartment reasonable for Fourth Amendment purposes.

The government argues that the evidence seized during the search of Mayes's apartment can also be admitted on these alternate grounds: that the search was private —i.e., it was not conducted by military law enforcement personnel—and therefore was outside the scope of the Fourth Amendment; and that Mayes had emptied his apartment and no longer had any reasonable expectation of privacy in the area from which the wad of paper was retrieved. In light of our finding that exigent circumstances justified the search of the apartment, we need not decide these issues.

Mayes contends that the indictment against him should have been dismissed because 1) Dr. Chadwick, an expert witness before the grand jury, examined secret grand jury materials; and 2) less than twelve grand jurors heard all the evidence presented. We first address the issue of disclosure of secret grand jury materials.

A number of public policy concerns underlie the need for grand jury secrecy.[1] Disclosure of certain grand jury materials to Dr. Chadwick to enable him to express his expert opinion concerning the cause of the child's death to the grand jury in no way contravened any of these policies. The government could have familiarized Dr. Chadwick with the facts surrounding the child's death by posing a complex hypothetical question. In the circumstances presented, this approach would have been unduly cumbersome. The most expeditious and reliable way for Dr. Chadwick to prepare for his expert testimony was to review transcripts of the testimony of prior grand jury witnesses and examine other evidence presented to the grand jury. Since he examined these materials under court supervision, sufficient safeguards existed to prevent abuse of the procedure.

Additionally, Fed.R.Crim.P. 6(e)(3)(C)(i) provides that a court may order disclosure of grand jury materials "preliminarily to or in connection with a judicial proceeding." We need not decide whether a grand jury proceeding is "a judicial proceeding" under Rule 6(e), as it seems clear that grand jury proceedings are at least preliminary to a judicial proceeding. *United States v. Stanford*, 589 F.2d 285, 292 (7th Cir. 1978).[2] We conclude that in the circumstances presented, the examination by Dr. Chadwick of grand jury materials was proper and the district court did not abuse its discretion by authorizing such disclosure under Rule 6(e).

Mayes's motion to dismiss the indictment because only eleven grand jurors attended every session raises an issue whose resolution is controlled by *United States v. Leverage Funding Systems, Inc.,* 637 F.2d 645 (9th Cir. 1980).

AFFIRMED.

---

1. Reasons for grand jury secrecy are stated in *United States v. Proctor and Gamble*, 356 U.S. 677, 681–682 n.6, 78 S.Ct. 983, 985–986 n.6, 2 L.Ed.2d 1077 (1958), *quoting United States v. Rose*, 215 F.2d 617, 628–629 (3rd Cir. 1954): "(1) To prevent the escape of those whose indictment may be contemplated; (2) to insure the utmost freedom to the grand jury in its deliberations, and to prevent persons subject to indictment or their friends from importuning the grand jurors; (3) to prevent subornation of perjury or tampering with the witnesses who may testify before grand jury and later appear at the trial of those indicted by it; (4) to encourage free and untrammeled disclosures by persons who have information with respect to the commission of crimes; (5) to protect innocent accused who is exonerated from disclosure of the fact that he has been under investigation, and from the expense of standing trial where there was no probability of guilt."

2. Citing *United States v. Tager*, 638 F.2d 167 (10th Cir. 1980), Mayes maintains that disclosure, under judicial supervision, of certain grand jury materials to Dr. Chadwick was improper under Rule 6(e)(3)(C)(i). *Tager* involved the propriety of a subsection (C)(i) disclosure of grand jury materials to a private, nongovernmental investigator to enable him further to assist governmental attorneys in an ongoing investigation. The court noted that a governmental attorney's need for assistance in the enforcement of federal criminal law is addressed, not by subsection (C)(i), but by subsection (A)(ii) of Rule 6(e) which limits disclosure to "government personnel." 638 F.2d at 170. Without expressing a view as to the correctness of the *Tager* decision, we note that Dr. Chadwick was not called upon to assist governmental attorneys as a private investigator in an ongoing investigation, but was asked to express his expert medical opinion based in part on certain evidence previously presented to the grand jury. As such Dr. Chadwick's expert testimony before the grand jury did not come within the provisions of subsection (A)(ii).