United States Court of Appeals,

Eleventh Circuit.

No. 95-4996.

Michael C. GOLD, Plaintiff-Appellee,

v.

CITY OF MIAMI, a Florida Municipal Corporation, Defendant,

Calvin Ross, individually, Rafael Suarez, individually, Jorge Perez, individually, William Campbell, individually, Defendants-Appellants.

April 7, 1998.

Appeal from the United States District Court for the Southern District of Florida (No. 92-1673-CIV-JWK), James W. Kehoe, Judge.

ON PETITION FOR REHEARING

(Opinion Sept. 17, 1997, 11th Cir., 121 F.3d 1442).

Before HATCHETT, Chief Judge, and TJOFLAT, ANDERSON, EDMONDSON, COX, BIRCH, DUBINA, BLACK, CARNES, BARKETT, HULL and MARCUS, Circuit Judges.

PER CURIAM:

The Court having been polled at the request of one of the members of the Court and a majority of the Circuit Judges who are in regular active service not having voted in favor of it (Rule 35, Federal Rules of Appellate Procedure; Eleventh Circuit Rule 35-5), rehearing en banc is DENIED.

BARKETT, Circuit Judge, dissenting:

I respectfully dissent from the court's denial of rehearing en banc. In this case, the panel held that the police officers who arrested Gold for disorderly conduct based solely on his comments to them were entitled to qualified immunity on Gold's false arrest claim. Despite the Supreme Court's holding in *City of Houston v. Hill,* 482 U.S. 451, 107 S.Ct. 2502, 96 L.Ed.2d 398 (1987), that the

First Amendment fully protects speech critical of police officers and a wealth of Florida Supreme Court precedent declining to apply the Florida disorderly conduct statute in factually similar circumstances to avoid conflict with the First Amendment, the panel held that Gold's First Amendment rights were not clearly established, and that the officers had arguable probable cause to believe that Gold's speech, standing alone, violated Florida's disorderly conduct statute. The panel's conclusion that the officers had arguable probable cause to make an arrest in this case contravenes this overwhelming body of caselaw. Accordingly, we should rehear this case *en banc*.

The disorderly conduct for which Gold was arrested consisted of Gold yelling from his car to a police officer, "aren't you supposed to give them a ticket for parking in a handicapped spot," upon seeing a woman who did not appear to be disabled walk to her car in a handicapped space and drive away. When the police did nothing, Gold

loudly remarked to no one in particular, "Miami police don't do shit."

....

Upon hearing Gold's remarks, a plainclothes officer who had been standing in the ATM line stated to the uniformed officer, "I think this guys [sic] got a problem." To this Gold replied, "I don't have a problem. I'm just saying that Miami police don't do shit."

*Gold v. City of Miami,* 121 F.3d 1442, 1444 (11th Cir.1997). Under binding U.S. Supreme Court and Florida Supreme Court precedent existing at the time of Gold's arrest, no reasonable officer could possibly have believed that Gold's words were criminal. Gold's speech is precisely the kind that lies at the core of the First Amendment. There is nothing in the facts of this case even remotely to suggest that Gold's speech could be construed as falling within the very narrow category of fighting words or any other category of constitutionally proscribable speech. Accordingly, the officers in this case were not entitled to qualified immunity.

Disregarding these applicable precedents, the court's opinion found that Gold had not shown

a violation of clearly established law, effectively holding that the law in a particular area is not clearly established for qualified immunity purposes, unless the plaintiff can point to a prior case involving identical facts. The panel's opinion emphasizes that, at the time of Gold's arrest, "no cases clearly established that [Gold's] actions did not constitute legally proscribed disorderly conduct." *Gold,* 121 F.3d at 1446. As the Supreme Court made explicitly clear in *United States v. Lanier,* --- U.S. ----, 117 S.Ct. 1219, 137 L.Ed.2d 432 (1997), such "fundamental similar[ity]" of underlying facts is not required to establish a violation of clearly established law. The purpose of qualified immunity, the *Lanier* Court explained, is simply to give government officials "fair warning" that their conduct violates federal constitutional or statutory rights. Comparing the "clearly established" concept in qualified immunity to the "fair warning" standard for a conviction under 18 U.S.C. §§ 241 and 242, the Court observed:

> In the civil sphere, we have explained that qualified immunity seeks to ensure that defendants "reasonably can anticipate when their conduct may give rise to liability," by attaching liability only if "[t]he contours of the right [violated are] sufficiently clear that a reasonable official would understand that what he is doing violates that right".... [B]oth [the "clearly established" test and the "fair warning" standard] serve the same objective, and in effect the qualified immunity test is simply the adaptation of the fair warning standard to give officials (and, ultimately, governments) the same protection from civil liability and its consequences that individuals have traditionally possessed in the face of vague criminal statutes. To require something clearer than "clearly established" would, then, call for something beyond "fair warning."

*Id.* at ----, 117 S.Ct. at 1227 (citations omitted).

The Court held that even under the standards necessary to support a criminal conviction, precedents involving "fundamentally similar" facts are not necessary to give state officials fair warning that their conduct contravenes constitutional rights:

> Nor have our decisions demanded precedents that applied the right at issue to a factual situation that is "fundamentally similar".... To the contrary, we have upheld convictions under § 241 or § 242 despite notable factual distinctions between the precedents relied on and the cases then before the Court, so long as the prior decisions gave reasonable warning that the conduct then at issue violated constitutional rights.

*Id.* Moreover, the Court recognized that some legal concepts are sufficiently clear that any reasonable person would know when his or her actions would violate those concepts:

> [G]eneral statements of the law are not inherently incapable of giving fair and clear warning, and ... a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though "the very action in question has [not] previously been held unlawful." As Judge Daughtrey noted in her dissenting opinion in this case, " "[t]he easiest cases don't even arise. There has never been ... a section 1983 case accusing welfare officials of selling foster children into slavery; it does not follow that if such a case arose, the officials would be immune from damages [or criminal] liability.' "

*Id.* at ---- - ----, 117 S.Ct. at 1227-28 (citations omitted).

Under *Lanier*'s fair warning standard, the police officers are not entitled to qualified immunity in this case. First, at the time of Gold's arrest, the Supreme Court had specifically held that speech critical of police officers is constitutionally protected. Second, as the panel opinion recognizes, the Florida Supreme Court had specifically reversed, as violative of the First Amendment, disorderly conduct convictions of defendants who had not only used expletives, but also made threatening comments to police officers—conduct far more egregious than Gold's. Finally, every other circuit that has addressed the issue of qualified immunity in a situation similar to that present here has had no trouble concluding that a police officer is not entitled to qualified immunity in these circumstances.

### Supreme Court Precedent

The court's opinion in this case wholly ignores the First Amendment's protection of speech critical of the police, failing even to mention the U.S. Supreme Court's governing precedent in this area. In *City of Houston v. Hill,* 482 U.S. 451, 107 S.Ct. 2502, 96 L.Ed.2d 398 (1987), the Supreme Court held that "the First Amendment protects a significant amount of verbal criticism and challenge directed at police officers." *Id.* at 461, 107 S.Ct. at 2509. Applying this principle, the Court invalidated a Houston ordinance making it illegal to interrupt an officer in any manner, reasoning

that "[t]he Constitution does not allow such speech to be made a crime. The freedom of individuals verbally to oppose or challenge police action without thereby risking arrest is one of the principal characteristics by which we distinguish a free nation from a police state." *Id.* at 462-63, 107 S.Ct. at 2510 (footnote omitted). The Court made clear that the First Amendment does not permit states to "provide the police with unfettered discretion to arrest individuals for words or conduct that annoy or offend them." *Id.* at 465, 107 S.Ct. at 2511-12; *see also Norwell v. City of Cincinnati,* 414 U.S. 14, 16, 94 S.Ct. 187, 188, 38 L.Ed.2d 170 (1973) (overturning conviction under disorderly conduct statute where "petitioner was arrested and convicted merely because he verbally and negatively protested Officer Johnson's treatment of him").

To be sure, the Court in *Hill* noted that "the freedom verbally to challenge police action is not without limits," *Hill,* 482 U.S. at 463 n. 12, 107 S.Ct. at 2510 n. 12 recognizing that " 'fighting words' which "by their very utterance inflict injury or tend to incite an immediate breach of the peace' are not constitutionally protected." *Id.* (quoting *Chaplinsky v. New Hampshire,* 315 U.S. 568, 572, 62 S.Ct. 766, 769, 86 L.Ed. 1031 (1942)). However, the fighting words doctrine has a narrower application where, as here, an individual's speech offends a police officer. *See Hill,* 482 U.S. at 462, 107 S.Ct. at 2510. As we have previously recognized, a police officer, "by virtue of his profession or training[, is] expected to absorb a certain amount of abuse without retaliating...." *Lamar v. Banks,* 684 F.2d 714, 718 n. 13 (11th Cir.1982); *see also Lewis v. City of New Orleans,* 415 U.S. 130, 135, 94 S.Ct. 970, 973, 39 L.Ed.2d 214 (1974) (Powell, J., concurring) ("[A] properly trained officer may reasonably be expected to "exercise a higher degree of restraint' than the average citizen, and thus be less likely to respond belligerently to "fighting words.' ") (quoting *Lewis v. City of New Orleans,* 408 U.S. 913, 913, 92 S.Ct. 2499, 2499, 33 L.Ed.2d 321 (1972) (Powell, J., concurring)). As the Supreme Court observed in *Hill,* " "[s]peech is often provocative and challenging.... [But it] is

nevertheless protected against censorship or punishment, unless shown likely to produce a *clear and present danger of a serious substantive evil that rises far above public inconvenience, annoyance, or unrest.*' " *Hill,* 482 U.S. at 461, 107 S.Ct. at 2509 (quoting *Terminiello v. City of Chicago,* 337 U.S. 1, 4, 69 S.Ct. 894, 895-96, 93 L.Ed. 1131 (1949) (emphasis added)); *accord Monroe v. State Court of Fulton County,* 739 F.2d 568, 575 (11th Cir.1984) ("A function of free speech is to invite dispute."); *Sweatt v. Bailey,* 876 F.Supp. 1571, 1580 (M.D.Ala.1995) ("[C]alling a law enforcement officer "an ass' within his earshot in the 1990's should not provoke a violent reaction and therefore does not fall within the "fighting words' doctrine.").

*Florida Law*

Consistent with these established First Amendment principles, Florida law protects the right of individuals to criticize the conduct of police officers, even using unpleasant and offensive words. Indeed, as the panel explicitly recognized, the Florida Supreme Court, in a series of cases involving speech critical of the police, has "made it clear that a person does not violate the disorderly conduct law merely by annoying those around [him] or by employing profane language to express outrage." *Gold,* 121 F.3d at 1445. Gold's actions fit squarely within this principle.

In *State v. Saunders,* 339 So.2d 641 (Fla.1976), the Florida Supreme Court held that Florida's disorderly conduct statute must be construed in light of the First Amendment and narrowed the reach of the statute to render it constitutional. The *Saunders* court construed the disorderly conduct statute

> so that it shall hereafter only apply either to words which "by their very utterance ... inflict injury or tend to incite an immediate breach of the peace," or to words, known to be false, reporting some physical hazard in circumstances where such a report creates a clear and present danger of bodily harm to others. We construe the statute so that no words except "fighting words" or words like shouts of "fire" in a crowded theatre fall within its proscription, in order to avoid the constitutional problem of overbreadth, and "the danger that a citizen will be punished as a criminal for exercising his right of free speech." With these two exceptions, Section 877.03 should not be read to proscribe the use of language in any fashion whatsoever.

*Id.* at 644 (citations omitted).

The Florida Supreme Court's cases construing the disorderly conduct statute in circumstances similar to those presented in this case, decided both before and after *Saunders,* clearly establish that the officers in this case could not have reasonably believed that they had probable cause to arrest Gold for criticizing the police. As the panel's opinion again recognizes, in *Morris v. State,* 335 So.2d 1 (Fla.1976), the Florida Supreme Court reversed a conviction for "disorderly conduct where a defendant merely directed profane language at police officers in the presence of others," *Gold,* 121 F.3d at 1445—precisely what Gold did here. Likewise, in *Gonzales v. City of Belle Glade,* 287 So.2d 669 (Fla.1973), the Florida Supreme Court overturned two disorderly conduct convictions, finding that the defendants' threatening comments to police officers and use of an "intemperate expletive or two" were insufficient to sustain the convictions. "In neither case was there any evidence that the actions of any of the appellants were more than annoying to those around them, and a violation ... requires more than the creation of a mere annoyance." *Id.* at 670; *see also White v. State,* 330 So.2d 3, 5 (Fla.1976) ("The statute must not be construed to limit the use of a socially impermissible word merely as a tool of communication.").

Indeed, in *White,* the Florida Supreme Court expressly recognized that "protected speech may provoke violent dissent," but found that such disagreement was not a basis for criminally punishing speech. *Id.* at 6. To permit the imposition of criminal sanctions merely because an individual's words "may have offended the sensibilities of [a police officer] and others who heard them" would be inconsistent with the core principle of the First Amendment: "the right vigorously to advance a minority opinion even though that opinion may anger others and arouse forceful disagreement." *Id.* (discussing *Hess v. Indiana,* 414 U.S. 105, 94 S.Ct. 326, 38 L.Ed.2d 303 (1973)). The *White* court drew a distinction between "mere words, used as a tool of communication," which

are protected "even though they may not be acceptable in certain strata of society," and the use of words to "invade the rights of others to pursue their lawful activities." *Id.* at 7. Finding the latter to be unprotected, the court found that the defendant could be convicted for screaming at the top of his lungs for several minutes at a police station, disturbing the other people at the station and impeding their work. Thus, White's words were not punished because they were offensive, but because "by their very decibel count, [those words] did invade the right of others to pursue their lawful activities." *Id.* at 6. Indeed, White's "conduct would have been equally disorderly had he merely recited "Mary Had a Little Lamb' in the same tone and under similar circumstances." *Id.* at 7.

Ignoring its context in *White,* the panel pointed to the language in *White* that " "[i]t is the degree of loudness, and the circumstances [under] which [the speech is] uttered, [that] takes [it] out of the constitutionally protected area,' " *Gold,* 121 F.3d at 1445 (citations omitted), to suggest that because of the "fact-intensive nature of the [First Amendment] inquiry," *id.* at 1446, the officers did not have fair warning that their arrest of Gold was unconstitutional. This completely misses the mark. It is true that the First Amendment inquiry in this case is a fact-specific one, requiring us to determine whether the police officers could reasonably have believed that Gold's words " "inflict[ed] injury or tend[ed] to incite an immediate breach of the peace'...." *Saunders,* 339 So.2d at 644 (quoting *White,* 330 So.2d at 7). While there will undoubtedly be some situations in which the facts will legitimately give the police arguable probable cause to believe that an individual's speech meets this standard, we are not faced with such a situation here. The panel does not even attempt to demonstrate that a police officer could reasonably have believed that Gold's speech constituted fighting words or any other category of proscribable speech. Nor could it. Here there was no crowd to incite;  there were no persons disturbed by Gold's speech. There were only police officers who

heard unpleasant criticism and two bystanders concerned about the police's treatment of Gold.[1] At best, the evidence showed that Gold's statements attracted the attention of the two bystanders, but this does not suffice to give the officers arguable probable cause. At worst, and clearly the most likely scenario, the evidence suggests that the officers arrested Gold to retaliate against him for his criticism of their performance—a blatant violation of the First Amendment principles set forth in *Hill.* We may not shirk our obligation to consider whether *any* facts exist to support arguable probable cause simply because the governing standard is a fact-specific one. *Cf. Smith v. Mattox,* 127 F.3d 1416, 1419 (11th Cir.1997) (analyzing "multifactored case-by-case balancing test" in concluding that officer's use of force "was so far beyond the hazy border between excessive and acceptable force that Mattox had to know that he was violating the Constitution").

The court also claims that there are "varying views in the Florida appellate courts of what constitutes legally proscribed disorderly conduct." *Gold,* 121 F.3d at 1446. But there are no "varying views" in the Florida Supreme Court—the only state court relevant for qualified immunity purposes. *See Jenkins v. Talladega City Bd. of Educ.,* 115 F.3d 821, 826 n. 4 (11th Cir.) (en banc) (qualified immunity analysis looks to "decisions of the U.S. Supreme Court, Eleventh Circuit Court of Appeals, [and] the highest court of the state where the case arose"), *cert. denied,* --- U.S. ----, 118 S.Ct. 412, 139 L.Ed.2d 315 (1997); *Hamilton v. Cannon,* 80 F.3d 1525, 1532 n. 7 (11th Cir.1996) (same). Assuming, arguendo, that the opinions of the intermediate state appellate courts are relevant here, they, likewise, cannot fairly be characterized as expressing "varying views." The principles set forth by the Florida Supreme Court in *Saunders, Gonzales, White,* and *Morris* have regularly

---

[1]As described in the panel opinion, the only evidence that Gold's comment had any effect whatsoever on anyone other than the arresting officers was that a couple waiting in line, observing the police's treatment of Gold, stated, "I can't believe they're doing this." There was also evidence that the couple spoke with Gold for several minutes.

been applied by Florida appellate courts to overturn convictions based on facts similar to those here. The panel ignores this long line of cases in which the courts have refused to apply the Florida disorderly conduct statute to speech critical of the police, citing instead only a single case to support its position, the decision in *L.J.M. v. State,* 541 So.2d 1321 (Fla. 1st DCA 1989). As explained below, however, *L.J.M.* is wholly inapposite here.

At the time of Gold's arrest, there were no fewer than five precedents from the state district appellate courts that made clear that Gold's arrest violated clearly established law. For example, in *Harbin v. State,* 358 So.2d 856 (Fla. 1st DCA 1978), a woman was arrested for directly cursing a Deputy Sheriff who had been sent to accompany her husband to the couple's trailer while he picked up his clothes after a domestic dispute. She contended that her "mere words" were not sufficient to justify a disorderly conduct arrest under the latest Florida Supreme Court decisions. Quoting from *Saunders, White* and *Morris,* the district court of appeals agreed, finding that Harbin's speech did not constitute fighting words under the Florida precedents:

> The focus of our inquiry here, then, must revolve around whether appellant's admittedly profane words tended to "incite an immediate breach of the peace."... [T]he most that can be said about appellant's epithets is that they were offensive to the deputy who made the arrest and perhaps an object of curiosity to the neighbor who opened her window.

*Id.* at 857. Likewise, in *K.Y.E. v. State,* 557 So.2d 956 (Fla. 1st DCA 1990), a Florida appellate court overturned defendant's disorderly conduct conviction for continually singing "fuck the police" in public. The court found "no evidence" that the singing "evoked a response tending to inflict injury or incite an immediate breach of the peace." *Id.* at 957. Defendant's singing, "while annoying and offensive to the arresting officer, at best contributed to attracting a group of curious onlookers, but ... did not breach the peace." *Id. See also D.C.E. v. State,* 381 So.2d 1097, 1099 (Fla. 1st DCA 1979) (holding a minor who shouted "f___ pigs" three times at police officers from the window of his car at a busy intersection did not violate disorderly conduct ordinance); *Clanton v. State,* 357

So.2d 455, 456-57 (Fla. 2d DCA 1978) (holding that man who loudly yelled at a police officer who opened his passenger door that he "had no damn right to open the door" did not violate disorderly conduct statute); *Phillips v. State,* 314 So.2d 619, 621-22 (Fla. 4th DCA 1975) (holding that an officer lacked probable cause to arrest a man who said "F___ you" to a police officer).[2] These cases make clear that the officers could not have reasonably believed that they had probable cause to arrest Gold since, as discussed above, his words, though offensive to the police, did not incite an immediate breach of the peace, but simply attracted the attention of two curious bystanders.

*L.J.M.* does not counsel a different conclusion. In *L.J.M.,* two officers were standing at the side of the street talking to a group of people when the defendant directly approached them and addressed certain remarks to them concerning his arrest the night before on theft charges. Defendant's statements were loud and rude, and "everybody was watching him as he yelled at [one of the police officers]." The officer tried to ignore the remarks, saying "[w]e'll see you in court." Instead of desisting in front of the crowd, defendant shouted to the officer, "Man, you pussy-assed mother fucker." At that point, he was arrested by the officer, who characterized his words as "disruptive." In affirming the conviction, the court found that, in the totality of these circumstances, "it was well within the discretion of the judge below, sitting as the trier of fact, to find that appellant

---

[2]Florida cases decided after the date of Gold's arrest confirm that Gold's arrest was contrary to clearly established Florida law. *See K.S. v. State,* 697 So.2d 1275, 1276 (Fla. 3d DCA 1997) (reversing disorderly conduct conviction where defendant's loud protests of police conduct "were not directed at the crowd but were instead a coarse expression of frustration at what K.S. perceived was an unjust accusation"); *Miller v. State,* 667 So.2d 325, 328 (Fla. 1st DCA 1995) ("Pursuant to *Saunders* and its progeny, ... there must be evidence of something more than loud or profane language or a belligerent attitude."); *B.R. v. State,* 657 So.2d 1184, 1185 (Fla. 1st DCA 1995) ("Although B.R.'s language was frustrating and annoying to the officer, there was no evidence that her screaming was of such a nature as to incite anyone in the area to an immediate breach of the peace."); *L.A.T. v. State,* 650 So.2d 214, 217-18 (Fla. 3d DCA 1995) (holding a " "fighting words' finding ... constitutionally unjustified as a matter of law" where "words neither themselves urged the crowd to respond nor actually had that effect").

uttered the above-quoted words with an intent to incite the police officer and perhaps others to violence." *L.J.M.,* 541 So.2d at 1323. *L.J.M.* has no applicability in this case; there is no evidence in this record that would permit an officer to reasonably conclude that Gold's statements were intended to incite the police officers or anyone else to violence. Unlike in *L.J.M.,* Gold did not directly approach the police and had not been arrested the night before by these officers; the police officers could not possibly have believed that Gold would lash out at them in violence or that he was attempting to incite them or any other bystanders to violence. To the extent that the panel construed *L.J.M.* to permit criminal liability where an individual is simply critical of police conduct, even when the expression includes a profane word uttered in a loud voice in the presence of others, that conclusion is in error, and, as shown above, in conflict, not only with federal constitutional principles of free speech, but with the clear law of Florida.

Not surprisingly, the panel's decision in this case also conflicts with the decisions of every other Circuit to address a police officer's entitlement to qualified immunity for arresting an individual for using abusive language. For example, in *Duran v. City of Douglas,* 904 F.2d 1372 (9th Cir.1990), the Ninth Circuit held that a police officer was not entitled to qualified immunity for stopping an individual after he insulted the officer. In words that apply equally here, Judge Kozinski explained that plaintiff's insult "represented an expression of disapproval towards a police officer with whom he just had a run-in. As such, it fell squarely within the protective umbrella of the First Amendment and any action to punish or deter such speech ... is categorically prohibited by the Constitution." *Id.* at 1378. Nor could the officers complain that these First Amendment principles were not clearly established.

> [G]overment officials in general, and police officers in particular, may not exercise their authority for personal motives, particularly in response to real or perceived slights to their dignity.... Whether or not officer Aguilar was aware of the fine points of First Amendment law, to the extent he is found to have detained Duran as punishment for the latter's insults,

> we hold that he ought to have known that he was exercising his authority in violation of well-established constitutional rights.

*Id.; see also Knox v. Southwest Airlines,* 124 F.3d 1103, 1109 (9th Cir.1997); *Mackinney v. Nielsen,* 69 F.3d 1002, 1007 (9th Cir.1995). *See also Spiller v. City of Texas City, Police Dep't,* 130 F.3d 162, 166 (5th Cir.1997) (holding that police officer was not entitled to a dismissal based on qualified immunity for arresting motorist who told the officer to "move his damn truck"); *Guffey v. Wyatt,* 18 F.3d 869, 871 (10th Cir.1994) (denying qualified immunity to an officer who arrested a referee at a hotly contested high school basketball game after the referee refused the officer's order to call more fouls); *Enlow v. Tishomingo County,* 962 F.2d 501, 509-10 (5th Cir.1992) (upholding denial of qualified immunity to a police officer based on *Hill* but remanding for resolution of factual disputes); *Buffkins v. City of Omaha,* 922 F.2d 465, 472 & n. 16 (8th Cir.1990) (denying qualified immunity where woman called police officer an "asshole"); *Bailey v. Andrews,* 811 F.2d 366, 371 (7th Cir.1987) (denying qualified immunity to officer who arrested plaintiff for stating "I want my damn dog" and "did you shoot my dog?").

For all the foregoing reasons, I believe that this case should be reheard en banc.