Ralph **DURAN**, husband; Alice Duran, wife, Plaintiffs–Appellees,

v.

**CITY OF DOUGLAS, ARIZONA,** a body politic; et al., Defendants,

and

Gilbert Aguilar, individually and as a police officer of the City of Douglas, Defendant–Appellant.

No. 89–15236.

United States Court of Appeals, Ninth Circuit.

Submitted Dec. 13, 1989.*

Decided June 4, 1990.

---

* The panel finds this case appropriate for submission without oral argument pursuant to Ninth Circuit Rule 34–4 and Fed.R.App.P. 34(a).

**1374**

Arthur C. Atonna, Douglas, Ariz., for defendant-appellant.

Tony K. Behrens, Sierra Vista, Ariz., for plaintiffs-appellees.

Before REINHARDT, BEEZER and KOZINSKI, Circuit Judges.

KOZINSKI, Circuit Judge:

Plaintiff Ralph Duran directed a series of expletives and an obscene hand gesture at defendant Gilbert Aguilar, a police officer. Officer Aguilar responded by detaining and arresting Duran, who, along with his wife, now brings this lawsuit for injuries he suffered during the incident.

I

In the late evening of November 18, 1987, Aguilar and another officer of the Douglas, Arizona, Police Department were dispatched to a downtown hotel in response to a bartender's complaints about an unruly patron. The officers arrived to find Duran intoxicated and threatening the bartender. Aguilar and Duran exchanged a few heated words, following which Aguilar escorted Duran out. Duran left the bar in an automobile driven by his wife, Alice.

Soon thereafter, while out on patrol, Aguilar observed a car with a passenger who was directing an obscene gesture toward him through an open window. Aguilar did not know the passenger's identity at that time because the car had darkly-tinted glass, making it impossible to observe its occupants except through the open window. It was, however, the car driven by Alice Duran, who was taking her husband home.

Duran's obscene gesture caught Aguilar's eye, and Aguilar began following the car. As he followed the Durans down a rural highway beyond the Douglas city limits, Ralph Duran began yelling profanities in Spanish and continued to make obscene gestures. At this point, Aguilar identified the passenger as the man he had confronted at the bar. Believing that Duran was "probably not going to be friendly," Aguilar Depo. (Sept. 13, 1988), CR 33, at 80–81, Aguilar called for backup and prepared to make a traffic stop.

Aguilar and backup officer Rudy Salazar followed the Durans' car into a mobile home park, where it stopped in front of what turned out to be their residence. Aguilar does not contend that Duran was yelling or otherwise causing a disturbance when the car drove into the park. Nevertheless, Aguilar initiated a traffic stop by turning on his emergency lights. Aguilar ordered Duran to step away from the car, to which Duran replied "I don't have to." Aguilar Affidavit, CR 104, at 3. Aguilar then told Duran that the reason for the

traffic stop was to find out why Duran had yelled profanities and made an obscene gesture toward him. Aguilar Depo. at 85–86. Duran responded with further profanities in both Spanish and English. In response, Aguilar decided to arrest Duran for disorderly conduct. *Id.* at 91–92. A scuffle ensued, during which Aguilar and Duran were injured before Duran was subdued and shackled. After his transport to the police station, it was discovered that Duran had a dislocated elbow requiring hospitalization. Duran claims to have suffered some permanent loss of range in his elbow.

█ The Durans brought this action for damages stemming from the allegedly unlawful stop and arrest against Aguilar, Salazar, the City of Douglas and various other police officers and city officials. The Durans filed a motion for partial summary judgment, seeking a determination of liability as to defendant Aguilar under 42 U.S.C. § 1983 (1982). Aguilar countered with his own motion for summary judgment on the grounds of qualified immunity. Following a hearing, the district court entered a single order ruling in favor of the Durans on both motions. Aguilar appeals the district court's order.[1]

## II

█ As a preliminary matter, the Durans contend that we lack jurisdiction over this appeal. A motions panel of this court has held that, on the basis of *Mitchell v. Forsyth,* 472 U.S. 511, 530, 105 S.Ct. 2806, 2817–18, 86 L.Ed.2d 411 (1985), we do have jurisdiction. *See Duran v. City of Douglas,* No. 89–15236 (9th Cir. Jun. 6, 1989)

(Order). Under the law of the case doctrine, "one panel of an appellate court will not as a general rule reconsider questions which another panel has decided on a prior appeal in the same case." *Kimball v. Callahan,* 590 F.2d 768, 770 (9th Cir.), *cert. denied,* 444 U.S. 826, 100 S.Ct. 49, 62 L.Ed.2d 33 (1979). The law of the case doctrine, however, is inapplicable to the question of our jurisdiction to consider an appeal. *United States v. Houser,* 804 F.2d 565, 568–69 (9th Cir.1986). We must therefore take a second look at plaintiffs' contention that we lack jurisdiction.

█ "The courts of appeals ... shall have jurisdiction of appeals from all *final decisions* of the district courts of the United States." 28 U.S.C. § 1291 (1982) (emphasis added). A district court's order denying a motion for summary judgment is not ordinarily a final decision, and is thus usually not reviewable on appeal. *Roth v. Veteran's Admin.,* 856 F.2d 1401, 1404 (9th Cir.1988). However, the Supreme Court has established a limited exception to this rule: "[A] district court's denial of a claim of qualified immunity, to the extent that it turns on an issue of law, is an appealable 'final decision' within the meaning of 28 U.S.C. § 1291 notwithstanding the absence of a final judgment." *Mitchell,* 472 U.S. at 530, 105 S.Ct. at 2817. So long as the issue on appeal "is a purely legal one"—whether the facts alleged by the plaintiff support a claim of violation of a clearly established constitutional right—we have jurisdiction. *See id.* at 528 n. 9, 105 S.Ct. at 2816 n. 9. Because Aguilar claims on appeal that the district court erred in finding that the Du-

1. Aguilar noticed his appeal as one "from an Order granting [the Durans'] Motion for Partial Summary Judgment on the issue of liability against Defendant Aguilar." Notice of Appeal, CR 83. The Durans contend that Aguilar has thus appealed only the grant of summary judgment in their favor, and not the denial of Aguilar's own motion for summary judgment on the grounds of qualified immunity. We disagree. "A mistake in designating the order being appealed is not fatal 'as long as the intent to appeal a specific judgment can be fairly inferred and the appellee is not prejudiced or misled by the mistake.'" *McCarthy v. Mayo,* 827 F.2d 1310, 1314 (9th Cir.1987) (quoting *United States*

*v. One 1977 Mercedes Benz,* 708 F.2d 444, 451 (9th Cir.1983), *cert. denied sub nom., Webb v. United States,* 464 U.S. 1071, 104 S.Ct. 981, 79 L.Ed.2d 217 (1984)). Here, Aguilar did not err in designating the order appealed; his only mistake was in identifying the portion of that order. Moreover, Aguilar relied extensively on the qualified immunity defense both in the district court and in his opening brief, both motions for summary judgment were resolved in the same order, and the Durans claim no prejudice from Aguilar's failure to mention specifically the denial of his own motion for summary judgment. Therefore, we construe the appeal as one of the entire district court order.

rans raised a material issue of fact as to whether defendant violated a clearly established right, we conclude that he may bring this appeal.

■ Likewise, Aguilar may appeal the district court's grant of summary judgment in favor of the Durans on the issue of section 1983 liability. The legal issues involved in that appeal—whether Aguilar violated clearly established constitutional protections—are identical to those governing the question of Aguilar's qualified immunity. As the relevant facts are not disputed, the resolution of the qualified immunity question will also decide the question of Aguilar's liability. Delaying our consideration of the liability issue until after the trial on damages would thus serve no purpose.[2]

### III

A. It is well settled that police officers and other state officials are entitled to qualified immunity from section 1983 suits. *See Davis v. Scherer*, 468 U.S. 183, 194 & n. 12, 104 S.Ct. 3012, & n. 12, 82 L.Ed.2d 139 (1984); *Wood v. Ostrander*, 879 F.2d 583, 591 (9th Cir.1989). A police officer's duties are both difficult and dangerous. Circumstances on the beat often require immediate action in order to prevent serious harm to persons or property; rarely is there time for brushing up on the Supreme Court's latest pronouncements on warrant requirements, probable cause or reasonable suspicion. Thus, police officers "generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzger-*

*ald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). This is an objective standard, *Anderson v. Creighton*, 483 U.S. 635, 641, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987), that leaves "ample room for mistaken judgments." *Malley v. Briggs*, 475 U.S. 335, 343, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986).

■ The police may therefore limit access to dangerous places and otherwise interfere with personal autonomy if such action is reasonably calculated to promote public safety. *See Maryland v. Buie*, —— U.S. ——, 110 S.Ct. 1093, 1098, 108 L.Ed.2d 276 (1990); *Mincey v. Arizona*, 437 U.S. 385, 392–93, 98 S.Ct. 2408, 2413–14, 57 L.Ed.2d 290 (1978); *United States v. Mayes*, 670 F.2d 126, 128 (9th Cir.1982). Similarly, the police may take whatever steps are reasonably necessary in executing duly authorized warrants. *Dalia v. United States*, 441 U.S. 238, 257–58, 99 S.Ct. 1682, 1693–94, 60 L.Ed.2d 177 (1979). And, the police may pursue and, if appropriate, detain individuals suspected of having been, or being, engaged in criminal activity. *United States v. Cortez*, 449 U.S. 411, 417, 101 S.Ct. 690, 694–95, 66 L.Ed.2d 621 (1981). These examples are illustrative rather than exhaustive.

■ Nevertheless, there are well-defined limits on what police officers may do in discharging their duties, and police may be held liable for acting outside these limits. Perhaps the most fundamental of these is the requirement that the police not interfere with the freedom of private persons unless it be for specific, legitimate reasons. *See Terry v. Ohio*, 392 U.S. 1, 21, 88 S.Ct. 1868, 1879–80, 20 L.Ed.2d 889 (1968). In

---

**2.** Defendant also contends that the district court erred in not considering Arizona Revised Statutes section 12–820.04, providing absolute immunity from punitive or exemplary damages based on state law tort actions for a public employee acting within the scope of his employment. Without deciding whether *Mitchell v. Forsyth* permits an appeal of a denial of a defendant's motion for summary judgment on the basis of state law immunity, we hold that the district court's decision not to consider the Arizona statute cannot be appealed in this case. The rationale underlying *Mitchell* is that qualified immunity "is an *immunity from suit* rather

than a mere defense to liability." 472 U.S. at 526, 105 S.Ct. at 2815 (emphasis original). The immunity is "an entitlement not to stand trial or face the other burdens of litigation, conditioned on the resolution of the essentially legal question whether the conduct of which the plaintiff complains violated clearly established law." *Id.* Here, the immunity provided by section 12–820.04 is merely one for a certain class of damages, not from a suit itself or every form of legal and equitable relief. Thus, *Mitchell*'s rationale of protecting public employees from litigation itself is inapposite.

the absence of a valid warrant, the police may generally not stop and detain an individual for investigation absent a reasonable belief that criminal or otherwise dangerous activity is afoot. *Cortez*, 449 U.S. at 417–18, 101 S.Ct. at 694–95.

Missing from the record here is any legitimate, articulate reason for Aguilar to have detained Duran. There was no evidence of a danger to public safety, and Aguilar was not executing a warrant. Nor is there any evidence that Duran was in possession of a controlled substance or had been or was about to be engaged in criminal activity. To be sure, Duran was intoxicated, but defendant does not contend that any law or ordinance prohibited Duran from riding as a passenger in an automobile while drunk.[3] Nor can Aguilar claim that he detained Duran on account of what had happened earlier in the evening at the bar: Aguilar had already confronted Duran regarding the incident and had let him go; there is no indication that Aguilar learned new facts to justify detaining Duran for further investigation of the earlier incident.

What then is left? Defendant relies heavily on the fact that Duran was making obscene gestures toward him and yelling profanities in Spanish while traveling along a rural Arizona highway. We cannot, of course, condone Duran's conduct; it was boorish, crass and, initially at least, unjustified. Our hard-working law enforcement officers surely deserve better treatment from members of the public. But disgraceful as Duran's behavior may have been, it was not illegal; criticism of the police is not a crime. *Houston v. Hill*, 482 U.S. 451, 461–63, 107 S.Ct. 2502, 2509–10, 96 L.Ed.2d 398 (1987).

Aguilar further contends that, even if Duran's verbal conduct was otherwise protected, he believed that it constituted disorderly conduct or a disturbing of the peace. However, because the car was traveling late at night on a deserted road on the outskirts of town, Duran's conduct could not have disturbed the peace or incited a riot; Aguilar has presented no evidence showing that it could have.[4] Nor could Duran's conduct suggest that he had committed or was about to commit any other illegal act. Indeed, one would expect someone engaged in shady business to act in a more stealthy fashion than did the plaintiff here. In sum, we don't see how Duran's boisterous conduct—tasteless though it may have been—gave Aguilar any cause to detain him. Absent such cause, the stop and detention was illegal and may be the subject of liability.

B. Duran's conduct is not totally irrelevant, however, as it suggests a possible motive for his detention, one upon which law enforcement officers may not legitimately rely. The Durans contend, and the district court held, that Aguilar

---

**3.** We need not resolve whether the police may stop a vehicle to determine whether the driver is under the influence of drugs or alcohol simply because of the presence of a drunk or unruly passenger. There are undoubtedly many instances when a car driven by a sober individual is used to transport intoxicated persons. For example, it is a widely-accepted safety technique to have one person in a group remain sober as the "designated driver" precisely so that others can drink without having to worry about driving home safely. Here, however, the issue is not presented; officer Aguilar disavowed any concern about the sobriety of the driver, admitting that he was only concerned with Ralph Duran's behavior. *See* Aguilar Depo. at 85–86.

**4.** Arizona's disorderly conduct statute provides:
  A. A person commits disorderly conduct if, with intent to disturb the peace or quiet of a neighborhood, family or person, or with knowledge of doing so, such person:
  1. Engages in fighting, violent or seriously disruptive behavior; or
  2. Makes unreasonable noise; or
  3. Uses abusive language or gestures to any person present in a manner likely to provoke immediate physical retaliation by such person....
  B. Disorderly conduct is a class 1 misdemeanor.
Ariz.Rev.Stat. § 13–2904 (1989).
  The First Amendment does not prevent enforcement of disorderly conduct statutes so long as they are not vague or applied to curb protected speech. *See Hill*, 482 U.S. at 465–67, 107 S.Ct. at 2511–13; *Colten v. Kentucky*, 407 U.S. 104, 111, 92 S.Ct. 1953, 1957–58, 32 L.Ed.2d 584 (1972). Here, because the only person Duran could have possibly disturbed was Aguilar, his speech was protected and the statute could not apply. *See Hill*, 482 U.S. at 461–63, 107 S.Ct. at 2509–10.

stopped their car at least partly in retaliation for the insult he received from Duran. If true, this would constitute a serious First Amendment violation. "[T]he First Amendment protects a significant amount of verbal criticism and challenge directed at police officers." *Hill*, 482 U.S. at 461, 107 S.Ct. at 2509. The freedom of individuals to oppose or challenge police action verbally without thereby risking arrest is one important characteristic by which we distinguish ourselves from a police state. *Id.* at 462–63, 107 S.Ct. at 2510. Thus, while police, no less than anyone else, may resent having obscene words and gestures directed at them, they may not exercise the awesome power at their disposal to punish individuals for conduct that is not merely lawful, but protected by the First Amendment.

■ Inarticulate and crude as Duran's conduct may have been, it represented an expression of disapproval toward a police officer with whom he had just had a run-in. As such, it fell squarely within the protective umbrella of the First Amendment and any action to punish or deter such speech—such as stopping or hassling the speaker—is categorically prohibited by the Constitution. Aguilar admits that he stopped Duran because he made an obscene gesture and yelled profanities toward him. Aguilar Depo. at 85–86. Because Aguilar might have detained Duran in retaliation for engaging in this protected speech and conduct, summary judgment in favor of Aguilar would have been inappropriate. At the same time, because Aguilar claims that he had no retaliatory motive—that he honestly believed Duran's actions indicated that criminal activity might be afoot—the district court's grant of summary judgment in favor of Duran on this issue was also error. There remains a material issue of fact, therefore, whether Aguilar intended to hassle Duran as punishment for exercising his First Amendment rights. To the extent the trier of fact determines that officer Aguilar stopped Duran in retaliation for

Duran's method of expressing his opinion, this would constitute a separate constitutional violation that could form the basis of liability under section 1983.[5]

■ C. The only remaining issue, then, is whether the rights here in question were so clearly established that officer Aguilar should have known he was acting illegally when he initiated the traffic stop. We believe they were. If there is one irreducible minimum in our Fourth Amendment jurisprudence, it is that a police officer may not detain an individual simply on the basis of suspicion in the air. No matter how peculiar, abrasive, unruly or distasteful a person's conduct may be, it cannot justify a police stop unless it suggests that some specific crime has been, or is about to be, committed, or that there is an imminent danger to persons or property. Were the law any different—were police free to detain and question people based only on their hunch that something may be amiss—we would hardly have a need for the hundreds of founded suspicion cases the federal courts decide every year, for we would be living in a police state where law enforcement officers, not the courts, would determine who gets stopped and when.

■ No less well established is the principle that government officials in general, and police officers in particular, may not exercise their authority for personal motives, particularly in response to real or perceived slights to their dignity. Surely anyone who takes an oath of office knows—or should know—that much. *See Hill*, 482 U.S. at 462, 107 S.Ct. at 2510. Whether or not officer Aguilar was aware of the fine points of First Amendment law, to the extent he is found to have detained Duran as punishment for the latter's insults, we hold that he ought to have known that he was exercising his authority in violation of well-established constitutional rights.

---

**5.** Because we uphold the district court's grant of summary judgment regarding liability for the violation of the Durans' Fourth Amendment rights, their separate claim of a First Amendment violation is probably redundant. The district court shall determine on remand whether resolution of the First Amendment issue would be superfluous.

## IV

Both parties seek attorneys' fees on appeal under 42 U.S.C. § 1988, which permits us to award reasonable fees *pendente lite* to the prevailing party in an action to enforce 42 U.S.C. § 1983. *See Texas State Teachers Ass'n v. Garland Independent School Dist.*, 489 U.S. 782, 109 S.Ct. 1486, 1492, 103 L.Ed.2d 866 (1989). Because the Durans have successfully defended the district court's judgment on appeal, they are the prevailing party. We accordingly grant their request for attorneys' fees. On remand, the district court shall determine the time reasonably expended by the Durans in defending on appeal the grant of summary judgment on the issue of section 1983 liability. The Durans are not entitled to fees relating to the issue of qualified immunity, nor to those other issues remanded for further proceedings. Aguilar's request for attorneys' fees is denied.

### Conclusion

The judgment of the district court is affirmed in part and reversed in part. The case is remanded for further proceedings consistent with this opinion.