**SQUAW VALLEY DEVELOPMENT COMPANY; Squaw Valley Ski Corporation; Squaw Valley Preserve, Plaintiffs–Appellants,**

v.

**Martin GOLDBERG; Harold Singer, Defendants–Appellees.**

No. 02–17346.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Feb. 11, 2004.

Filed July 20, 2004.

G. David Robertson and Kirk C. Johnson, Robertson & Benevento, Reno, NV, for the plaintiffs-appellants.

Janill L. Richards, Deputy Attorney General, State of California, Oakland, CA, for the defendants-appellees.

Before: TASHIMA and CLIFTON, Circuit Judges, and LEIGHTON, District Judge.[*]

TASHIMA, Circuit Judge:

Squaw Valley Development Company, Squaw Valley Ski Corporation and Squaw Valley Preserve (collectively, "Squaw Valley") filed this action under 42 U.S.C. § 1983, alleging that two employees of the California Regional Water Quality Control Board, Lahontan Region (the "Lahontan Board") subjected them to selective and over-zealous regulatory oversight in violation of their constitutional rights to equal protection and substantive due process. The district court granted summary judgment in favor of the employees, Harold Singer and Martin Goldberg, on the ground that they are entitled to qualified immunity because there is no triable issue of material fact that a constitutional violation had been committed. Because Squaw Valley presented evidence that Singer may have been motivated by personal animus, we reverse the grant of summary judgment as to Squaw Valley's "class of one" equal protection claim against Singer, but affirm on the remaining claims.

[*] The Honorable Ronald B. Leighton, United States District Judge for the Western District of Washington, sitting by designation.

## FACTUAL AND PROCEDURAL BACKGROUND

### I. Factual Background

Squaw Valley owns and operates a ski resort on approximately 4,200 acres in Placer County, California. The resort is naturally traversed by the South Fork of Squaw Creek (the "South Fork"). Downstream of Squaw Valley's property, the South Fork merges into Squaw Creek proper, which eventually drains into the Truckee River. Squaw Valley is one of approximately 800 "dischargers" subject to regulatory oversight by the Lahontan Board.

The Lahontan Board is one of nine regional boards authorized to regulate and protect California's water resources. It has a small governing board and a staff of over 70 employees (the "Staff"). Singer is and has been the Lahontan Board's Executive Officer since 1989; he directs the Staff. Goldberg has been an environmental scientist on the Staff since April 1999. Although Singer appointed Goldberg to his position, Singer does not directly (immediately) supervise Goldberg.

Singer's duties include enforcing various provisions of the California Water Code pursuant to the authority delegated to him by the Lahontan Board. Singer has the authority to take certain regulatory actions independently from the Lahontan Board; for example, he is authorized to issue a Complaint for Administrative Civil Liability ("ACL") or a Cleanup and Abatement Order ("CAO"). Goldberg also has some authority to enforce California's water quality standards by inspecting and monitoring dischargers' facilities for compliance, and issuing Notices to Comply or

Notices of Violations. The Lahontan Board itself may take action when a discharger violates a water quality regulation by issuing Waste Discharge Requirements ("WDRs") or civil liability orders, or by referring violations to the California Attorney General. When a matter is before the Lahontan Board for decision, the Staff recommends a course of action and provides information to assist in the decision-making.

Squaw Valley's environmental water quality obligations are primarily set forth in two documents: (1) the Basin Plan, adopted by the Lahontan Board in October 1994; and (2) Squaw Valley's most recent WDRs, issued by the Lahontan Board on April 8, 1993.

### A. The Basin Plan

The Basin Plan "sets forth water quality standards for the surface and groundwater of the [Lahontan] Region, which include both designated beneficial uses of water and the ... numerical objectives which must be maintained or attained to protect those uses." The Basin Plan includes water quality 9563 objectives for numerous contaminates, including turbidity.[1] The Basin Plan requires that all waters of the Lahontan Region "shall be free of changes in turbidity that cause nuisance or adversely affect the water for beneficial uses" and "[i]ncreases in turbidity shall not exceed natural levels by more than 10 percent." The Basin Plan imposes additional water quality objectives for specific water bodies and hydrologic units, including the Truckee River Hydrologic Unit. In the Truckee River unit, "[t]he turbidity shall not be raised above 3 Nephelometric

Turbidity Units (NTU) mean of monthly means [MOMM]."[2]

### B. The WDRs

The Lahontan Board issued WDRs which contain water quality objectives and other standards that apply specifically to Squaw Valley. The WDRs contain Squaw Valley's turbidity objective:

4. The discharge of surface flows generated within the facility, or as a result of earth disturbance within the facility, shall not cause the following conditions or alterations in surface waters of the Truckee River Hydrologic Unit:

. . . .

C. The turbidity of waters shall not be raised above 3 NTU (Nephelometric Turbidity Units), mean of monthly means. In no instance shall an increase in turbidity exceed natural levels by more than 10 percent.

### C. Regulation of Squaw Valley

Squaw Valley's history of non-compliance with water quality requirements extends back into the 1970s. The Lahontan Board adopted a Cease and Desist Order against Squaw Valley in 1976, and imposed a Stipulated Judgment in 1978. The Lahontan Board also issued CAOs against Squaw Valley in January 1983, September 1983, August 1985, and November 1985. In 1992, Squaw Valley settled an enforcement action resulting from a fuel spill. The Lahontan Board issued an ACL against Squaw Valley in January 1994, and issued more CAOs in August 1994, November 1995, March 1998, and March 1999. Despite this regulatory history, Squaw Valley asserts that prior to 1999 the rela-

---

1. Turbidity refers to "suspended sediment," or the amount of dirt in the water.

2. NTU is a way of quantifying turbidity. MOMM is a way of averaging sampling re-

sults to dampen the impact of any very high, or very low, values obtained in taking discrete samples.

tionship between the parties "was relatively good."

From 1989 to 1999, Jerry Peacock was the regulator assigned to Squaw Valley. Peacock has a Bachelor of Science degree in civil engineering from the University of California, Berkeley, a Masters Degree in hydrology from Stanford University, and is a registered professional engineer. As a senior staff engineer, Peacock handles the majority of the most complex dischargers that the Lahontan Board oversees. Squaw Valley contends it had few water quality violations during Peacock's tenure, and that Peacock "got along pretty well" with Squaw Valley personnel.

Singer expressed concerns that Peacock was overextended, and in 1999, Singer removed Peacock and assigned Goldberg to oversee Squaw Valley.[3]

Goldberg had no prior experience as a regulator and was promoted from a "student assistant"—a mostly clerical position—to his position overseeing Squaw Valley. Goldberg's formal education consisted of a degree in soil science from California Polytechnic State University, San Luis Obispo, and, as of August 2002, while working for the Lahontan Board 20 hours a week, he was pursuing a Masters of Science degree in soil science at the University of California, Davis. In June 2002, in a proposal to the Lahontan Board regarding his master's program, Goldberg wrote that "as a young regulator [he] found that [he] did not have the background, broadscale expertise, or scientifically validated field studies with which to critically evaluate [Squaw Valley's and other ski resorts'] projects."

Initially, Singer assigned Goldberg to oversee Squaw Valley exclusively. Singer informed Goldberg that because of Squaw Valley's compliance record and the complexity of the facilities, it warranted a greater amount of oversight than what had been previously provided and what was required of many other dischargers. As a result, Goldberg has been exacting and thorough in his dealings with Squaw Valley.

Squaw Valley's Facility Violation History shows that for 10 years, from 1989 to 1999, Peacock noted an average of one water quality violation per year; however, Goldberg reported at least 21 violations within his first year of overseeing Squaw Valley. Goldberg acknowledges his frustration with Squaw Valley and explains that he has favored formal over informal regulatory action because, in his view, "[c]apturing Squaw Valley's attention has been an ongoing problem ... they are repeat violators" who "often dispute[ ] the validity" of his suggestions. Goldberg's immediate supervisor also declared that he pays particularly close attention to Squaw Valley because "Squaw Valley questions or disputes almost every regulatory or enforcement action ... and because of the long history of [non-compliance]."

## D.  The Turbidity Dispute

The natural background level of turbidity in the South Fork is unknown. However, experts, including Peacock, believe the turbidity levels of the North Fork of Squaw Creek are a good indicator of background turbidity. The North Fork's MOMM turbidity is 4.3 NTUs.

Peacock drafted Squaw Valley's "turbidity objective" in 1993. During Peacock's tenure, he treated the objective as allowing an increase in turbidity of 3 NTUs over the natural background levels. During

---

**3.**  Singer also declared that he has a policy of rotating staff to have "new eyes" oversee a discharger. However, he had not "rotated" Peacock during the previous 10 years and does not seem to have rotated Goldberg since assigning him to Squaw Valley in 1999.

this time, Singer sent a letter endorsing the "above background" turbidity objective.[4] Accordingly, prior to 1999, Squaw Valley could cause increases in turbidity up to 7.3 NTUs (*i.e.*, 3 NTUs higher than background).

Goldberg applied a turbidity standard whereby the MOMM turbidity could never exceed 3 NTUs total. Singer also endorsed this "absolute" standard and, notwithstanding his prior letter, contends that he always interpreted the Basin Plan and Squaw Valley's WDRs as setting an "absolute" limit on turbidity. This "absolute" standard requires Squaw Valley's property to contain less sediment than is naturally occurring (*i.e.*, reduce the background turbidity of 4.3 NTUs to 3.0 NTUs).

At his deposition, Peacock testified that he did not know until 2002 that the Lahontan Board had stopped interpreting Squaw Valley's turbidity objection as "above background." He also testified that the Lahontan Board attempts to apply the same turbidity standard to all ski areas. The Lahontan Board does not, however, interpret any other ski resort's turbidity objective as "absolute." Moreover, the "absolute" standard is specifically different than the standard applied to nearby dischargers, Resort at Squaw Creek and Homewood, which have differently worded WDRs.

### E. Exceptional Enforcement Actions

On June 20, 2000, agents from the Environmental Protection Agency ("EPA"), accompanied by Goldberg, executed a search warrant at Squaw Valley's corporate offices in search of federal Clean Water Act violations. The affidavit that secured the warrant was based on information provided by the Staff. After a two year investigation, the EPA dropped its investigation based on a lack of evidence that Squaw Valley had violated any water quality laws.

On August 10, 2000, Singer appeared before the Placer County Planning Commission to recommend that Squaw Valley prepare an Environmental Impact Report ("EIR") prior to commencing construction of a chairlift. Singer had never previously appeared before a county planning commission to argue that an EIR should be required for a construction project. Singer explained that he appeared at the hearing at the County's request, and that although he had never previously appeared to request an EIR, he and staff had in fact recommended that EIRs be prepared for other types of projects in the County.

On May 11, 2001, the Lahontan Board held a hearing to consider Singer's recommendation to refer Squaw Valley to the Attorney General for civil enforcement. Singer had never previously recommended referral to the Attorney General for any other discharger.

Squaw Valley contends that prior to the hearing, Goldberg would note, but hide, certain regulatory violations in order to magnify Squaw Valley's alleged wrongdoing to secure a referral by the Lahontan Board to the Attorney General. Squaw Valley's primary enforcement officer, Mike Livak, declared that Goldberg told him that these violations were innocuous. However, one of Goldberg's violation entries explains that "No further action taken at this time because this violation will be incorporated into the AG referral for violation of the CAO."

---

4. In 1995, a member of the Staff signed a letter on Singer's behalf endorsing the "above background" interpretation of the turbidity objective. Although Singer declared that he never read the letter, on summary judgment, because we must construe all facts in favor of the non-moving party, we infer that Singer sent this letter.

At the hearing, Goldberg acted as one of the chief presenters on behalf of the Staff. Squaw Valley contends that Goldberg intentionally misrepresented to the Lahontan Board that: (1) Squaw Valley violated water quality objectives and harmed beneficial uses of Squaw Creek water; and (2) the background turbidity level for the South Fork is 2.9 NTUs. Squaw Valley also ·contends that Goldberg and Singer did not inform the Lahontan Board that they had changed the historical interpretation of the 3 NTU standard from an "above background" standard to an "absolute" standard, and that this new interpretation applied only to Squaw Valley and not to any other ski resort in the region.[5]

At the conclusion of the hearing, the Lahontan Board voted unanimously to refer the matter to the Attorney General's Office. Bea Cooley, the Lahontan Board chair, described the Lahontan Board's decision in her declaration:

> The Regional Board listened closely and patiently to both staff and Squaw Valley's presentations, including discussions about water turbidity standards. Ultimately, the Regional Board concluded that the violations—which were not limited to violations of the turbidity standard—were egregious and the evidence of violations was overwhelming and, accoringly, the matter would be referred to the Attorney General.

### F.   Treatment of Other Dischargers

Squaw Valley contends that other similarly situated dischargers were treated more favorably than it was treated:

- The only scientific study of sediment in Squaw Creek concluded that approximately 80% of the creek's sediment comes from the North Fork and the sandy banks downstream of Squaw Valley's property. However, Lahontan is not pursuing any other property owners for their disproportionate sediment discharges into Squaw Creek.

- In contrast to Goldberg's practice of noting even minor infractions by Squaw Valley, Northstar-at-Tahoe caused a "six-fold increase in turbidity ... [from July 1, 1998 through June 30, 1999, which] was not noted in the file and no action was taken."

- Homewood Mountain Resort obtained a 17-year extension to comply with WDRs enacted to prevent "negligent or intentional" discharge of greases, oils and sediment. By contrast, Singer and Goldberg aggressively pursued Squaw Valley for violating the turbidity objective.

- Goldberg approved a United States Department of Agriculture project to grade an area for a snow study plot in one week. The grading was to be performed on Squaw Valley's property, using Squaw Valley's personnel, and equipment. By contrast, Goldberg "dragged his feet" reviewing a comparable soil project proposed by Squaw Valley, and eventually recommended an EIR rather than approving the project.

Squaw Valley also contends that Singer was imposing minimal or no civil liabilities against dischargers with significant noncompliance histories who were discharging deadly chemicals into drinking water, Lake Tahoe's surface waters, a Lake Tahoe tributary, wetlands, and directly into the Truckee River; while Singer was imposing severe penalties against Squaw Valley and referring it to the Attorney General for, primarily, violating the turbidity objective.

---

5.   Both Goldberg and Singer dispute that they made misrepresentations at the May 11, 2001 hearing.

## II. Procedural Background

Squaw Valley filed this § 1983 action against Singer and Goldberg, in their individual capacities, alleging equal protection and substantive due process violations. Subsequently, the Staff, including Singer and Goldberg, made a second presentation to the Lahontan Board recommending a CAO against Squaw Valley. Although Squaw Valley made an opposing presentation disputing the calculation of its turbidity levels, the Lahontan Board voted to authorize the issuance of a CAO against Squaw Valley.

In January 2002, during the pendency of this action, the Attorney General filed a civil enforcement action against Squaw Valley in Placer County Superior Court for violations of the Porter–Cologne Water Quality Control Act and failure to comply with numerous water quality standards—including the turbidity objective.

On August 30, 2002, Singer and Goldberg filed a motion for summary judgment arguing that they are entitled to qualified immunity. The district court granted the summary judgment motion on the ground that Squaw Valley had not made out a prima facie case of a constitutional violation. The district court entered judgment in favor of Singer and Goldberg, and Squaw Valley appealed.

## STANDARD OF REVIEW

The district court's grant of summary judgment is reviewed de novo. *United States v. City of Tacoma,* 332 F.3d 574, 578 (9th Cir.2003). Viewing the evidence in the light most favorable to the non-moving party, we must decide whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law. *Id.* The district court's grant of summary judgment may be affirmed on any ground supported by the record. *Simo v. Union of Needletrades,* 322 F.3d 602, 610 (9th Cir.2003).

## DISCUSSION

## I. Section 1983 and Qualified Immunity

42 U.S.C. § 1983 "creates a private right of action against individuals who, acting under color of state law, violate federal constitutional or statutory rights." *Devereaux v. Abbey,* 263 F.3d 1070, 1074 (9th Cir.2001) (en banc). "Qualified immunity, however, shields § 1983 defendants '[f]rom liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Id.* (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982) (alteration in the original)).

Under *Saucier v. Katz,* 533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001), the first step in the qualified immunity analysis is "to consider the materials submitted in support of, and in opposition to, summary judgment, in order to decide whether a constitutional right would be violated if all facts are viewed in favor of the party opposing summary judgment." *Jeffers v. Gomez,* 267 F.3d 895, 909 (9th Cir.2001). "If no constitutional violation is shown, the inquiry ends." *Cunningham v. City of Wenatchee,* 345 F.3d 802, 810 (9th Cir. 2003). On the other hand, if "the parties' submissions" create a triable issue of whether a constitutional violation occurred, the second question is "whether the right was clearly established." *Saucier,* 533 U.S. at 201, 121 S.Ct. 2151. A constitutional right is clearly established when "it would be clear to a reasonable [government actor] that his conduct was unlawful in the situation he confronted." *Id.* at 202, 121 S.Ct. 2151.

Singer and Goldberg argue that they are entitled to qualified immunity because Squaw Valley has not shown a violation of the Equal Protection Clause or of substantive due process.

## II. Equal Protection Claim

▉ The Equal Protection Clause ensures that "all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 439, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985). The equal protection guarantee protects not only groups, but individuals who would constitute a "class of one." *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564, 120 S.Ct. 1073, 145 L.Ed.2d 1060 (2000); *SeaRiver Maritime Fin. Holdings, Inc. v. Mineta*, 309 F.3d 662, 679 (9th Cir.2002). Where, as here, state action does not implicate a fundamental right or a suspect classification, the plaintiff can establish a "class of one" equal protection claim by demonstrating that it "has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Village of Willowbrook*, 528 U.S. at 564, 120 S.Ct. 1073. Where an equal protection claim is based on "selective enforcement of valid laws," a plaintiff can show that the defendants' rational basis for selectively enforcing the law is a pretext for "an impermissible motive." *Freeman v. City of Santa Ana*, 68 F.3d 1180, 1187–88 (9th Cir.1995) (internal quotation marks and citation omitted); *Armendariz v. Penman*, 75 F.3d 1311, 1327 (9th Cir.1996) (en banc).

Squaw Valley contends that it submitted sufficient evidence to create a triable issue of material fact regarding whether: (1) it was singled out for unique regulatory and enforcement treatment; (2) Singer's and Goldberg's actions were arbitrary or irrational; and (3) even if there was a stated rational basis for the unequal treatment,

that proffered basis was a pretext because Singer and Goldberg were motivated by malignant animosity.

### A. Disparate Treatment

Singer and Goldberg concede that "Squaw Valley has shown disparate or unique treatment" because they "have afforded Squaw Valley more oversight ... and have[favored] more formal regulatory and enforcement action" as compared to other similarly-situated dischargers.

### B. Rational Basis

▉ Disparate government treatment will survive rational basis scrutiny "as long as it bears a rational relation to a legitimate state interest." *Patel v. Penman*, 103 F.3d 868, 875 (9th Cir.1996). Although "[s]elective enforcement of valid laws, without more, does not make the defendants' action irrational," *Freeman*, 68 F.3d at 1188, there is no rational basis for state action " 'that is malicious, irrational or plainly arbitrary.' " *Armendariz*, 75 F.3d at 1326 (quoting *Lockary v. Kayfetz*, 917 F.2d 1150, 1155 (9th Cir.1990) (as amended)).

Singer and Goldberg have proffered a rational basis to compel compliance with water quality laws by a discharger they reasonably perceive to be recalcitrant. *See Armendariz*, 75 F.3d at 1328 ("The City has an obvious interest in preventing safety and sanitation hazards by enforcing the housing code."); *Freeman*, 68 F.3d at 1188 (reasoning that the city reasonably denied a dance permit "for a reason authorized by the city's ordinance"). Specifically, Singer decided that Squaw Valley warranted greater regulatory oversight because of its size, activity level, and history of non-compliance. Similarly, Goldberg tended to take more formal regulatory action against Squaw Valley because of its compliance problems and because Squaw

Valley regularly disputed Goldberg's recommendations.

Squaw Valley argues that its non-compliance history cannot justify: (1) regulating it more than landowners whose property is discharging 80% of the turbidity into Squaw Creek; (2) applying a different turbidity standard to Squaw Valley than to other nearby ski areas; and (3) Goldberg's practice of noting every conceivable violation at Squaw Valley while ignoring substantial violations at other sites. Squaw Valley also contends there is no rational basis for subjecting it to severe regulatory penalties—including referral to the Attorney General—while allowing dischargers of toxic wastes to be subjected to no, or lesser, penalties.

First, in any equal protection analysis, it is necessary to identify the class or group being discriminated against. *See Freeman*, 68 F.3d at 1187. Here, Squaw Valley contends it is being singled out from all other dischargers. However, it presents no evidence that any other discharger is of comparable size, has a comparable history of non-compliance, engages in a comparable level of activity on its land, and has a comparable history of administrative action being ineffective. As the district court repeatedly stated, Squaw Valley is not comparing "apples to apples."

Second, as to other landowners contributing to the turbidity of Squaw Creek, Squaw Valley has specifically not provided any evidence regarding the identity of these landowners; let alone evidence that they are as large, have the same or worse histories of non-compliance, have the same level of activity on their property, or that they disputed Singer and Goldberg's regulatory suggestions. Simply put, disparate treatment of these landowners cannot form the basis of Squaw Valley's equal protection claim.

Third, as to the "absolute" turbidity standard, the evidence submitted shows that other ski resorts have differently worded turbidity objectives in their WDRs. Accordingly, Singer and Goldberg have a specific rational reason for reading Squaw Valley's turbidity objective differently than that of comparable dischargers. Moreover, to the extent the turbidity objective is unfair, neither Singer nor Goldberg actually have the authority to alter the objective.

Finally, as to the claims of imposing more severe penalties against Squaw Valley than other dischargers, the record does support that Singer imposed harsher penalties on Squaw Valley than on some other dischargers. However, again, Squaw Valley has simply not provided evidence that these dischargers are similarly situated. As for the referral to the Attorney General, as Singer and Goldberg explained, more formal regulatory enforcement is a rational way to deal with a discharger perceived to dispute less formal regulatory suggestions.

In total, it is not enough to show that of the 800 dischargers regulated by the Lahontan Board, Singer and Goldberg favored more formal enforcement measures against Squaw Valley. As regulators, they articulated a rational reason for their actions—they perceived Squaw Valley to be a large and active discharger, with a history of non-compliance, that resisted less severe regulatory efforts. Thus, to succeed on its equal protection claims, Squaw Valley must show that Singer and Goldberg were motivated by some personal or extra-statutory end.

## C. Pretext

In this circuit it is clearly established that a plaintiff may pursue an equal protection claim by raising a "triable issue of fact as to whether the defendants' asserted[rational basis] ... was merely a

pretext" for differential treatment. *Armendariz*, 75 F.3d at 1327 (finding equal protection case law clearly established that city officials could not target plaintiffs for overzealous enforcement of housing code); *Fajardo v. County of Los Angeles*, 179 F.3d 698, 700 n. 2 (9th Cir. 1999) ("If Defendants' justification for discriminating against domestic-violence crimes is nothing more than pretextual, then Defendants' actions are arbitrary and violate the Equal Protection Clause.").

■ On summary judgment, an equal protection plaintiff may show pretext by creating a triable issue of fact that either: (1) the proffered rational basis was objectively false; or (2) the defendant actually acted based on an improper motive. *See Patel*, 103 F.3d at 876 (recognizing that pretext might be shown if the city was "using its code enforcement process not to enforce compliance with the codes but rather to drive ... downtown motels out of business"); *Armendariz*, 75 F.3d at 1327 (finding "a triable issue of fact as to whether the [city's] asserted rationale of directing efforts to enforce the housing code in high-crime areas was merely a pretext" to reduce property values for the city to purchase them at a reduced rate); *Lockary*, 917 F.2d at 1155 ("Although a water moratorium may be rationally related to a legitimate state interest in controlling a water shortage" the plaintiffs raised a triable issue of fact regarding the "very existence of a water shortage.").

### (1) Singer

Singer and Goldberg acknowledge that "there is no love lost" between them and Squaw Valley. In his declaration, Singer conceded that his "relationship with Squaw Valley representatives has become strained," and that he has "lost patience for endless meetings with Squaw Valley representatives when ... Squaw Valley is not serious about taking care of its compliance problems."

Squaw Valley's president, Nancy Wendt, also testified that her relationship with Singer before June 2000 was "extremely difficult to the point of—[feeling] a lot of hostility from him." She stated that Singer "was resentful of[her] ... didn't like [her] ... he was hostile towards [her], dismissive ... would be the best word."

Squaw Valley contends that an exchange between Singer and Wendt in early 1999 provided the impetus for "Singer's campaign of vengeance." Wendt declared that at a meeting she "obviously embarrassed" Singer in front of a group of his peers by pointing out that Singer had previously been mistaken about a recommendation and that she "could see that he was angry as a result."

Michael Livak, Director of Planning for Squaw Valley, declared that subsequent to the 1999 event, Singer showed disdain for Wendt:

I have seen him become personally annoyed with Nancy Wendt, and the annoyance seemed more personal in nature than would be merited by his capacity as the executive officer of Lahontan. And the body language that he has used in his interactions with Miss Wendt has led me to believe that he resents her or has a low opinion of her.

. . . .

Sometimes when Nancy would speak or she would finish speaking, [Singer] would fold his arms and look up at the ceiling in disgust or otherwise convey his low opinion of Ms. Wendt or in some way suggest that what she was saying was not relevant. He might cut her off or angrily sort of draw the line and tell her: "I don't want to discuss that anymore," this type of thing. And he has

never, to my recollection, taken that approach with me or with other representatives from Squaw Valley.

Livak also stated that Singer has "gotten in[his] face," and become verbally "perturbed" and "aggressive" toward him during meetings and on the phone.

Wendt testified that Singer's treatment became so obvious that her peers began to comment upon the situation:

> What about the way he treats the other ski area managers. They think it's a joke when I'm around with the other ski area managers.... [T]hey tease me and say, oh, well, gee, it's a good thing, you know, Harold treats you this way, because it takes the heat off of us. ·
>
> ....
>
> [T]hey were glad that [Singer] had this fixation on me and Squaw Valley so that there was no ... significant regulatory enforcement on them.

Squaw Valley contends that in addition to showing that Singer harbored animosity toward it and Wendt, several other facts raise a triable issue regarding whether Singer's justification for increasing Squaw Valley's regulatory oversight was pretextual.

First, despite stating that Squaw Valley's history of non-compliance justified the disparate treatment, at his deposition, Singer was unable to identify a single instance of Squaw Valley's regulatory non-compliance: "I don't know the extent of or if there were any violations at Squaw Valley during the period of time that Mr. Peacock was the person assigned to that specific district."

Second, Squaw Valley observes that if Singer was genuinely concerned with properly enforcing water quality laws, he would not have replaced the experienced Peacock with an inexperienced regulator, Goldberg. Squaw Valley contends that Singer needed Peacock removed from overseeing Squaw Valley in order to change the interpretation of Squaw Valley's turbidity objective so that Singer could claim that Squaw Valley was in violation of the WDRs.

■ The district court found that Singer appears to harbor actual "hostility" and "antagonism" toward Squaw Valley, not just simple frustration. We must view the evidence submitted in the light most favorable to Squaw Valley. *Flores v. Morgan Hill Unified Sch. Dist.*, 324 F.3d 1130, 1135 (9th Cir.2003). Viewing the evidence in the light most favorable to Squaw Valley, we agree with the district court that Singer harbors a genuine animosity toward Squaw Valley. Moreover, in light of Singer's inability to recollect a single instance when Squaw Valley failed to comply with water quality laws, we conclude that there is a triable issue of fact regarding whether Singer's justification for disparate treatment was a pretext to unconstitutionally enforce water quality laws against an entity toward which he harbored animosity.

### (2) Goldberg

Although Squaw Valley employees also describe Goldberg's oversight as "harassing," Squaw Valley itself argues that Goldberg's regulatory discretion was circumscribed by Singer. For example, Squaw Valley notes that Singer specifically told Goldberg to issue a Notice of Violation to Squaw Valley for even the "most minor of infractions," and that Goldberg "did not have latitude and choice in the matter" of whether to issue a Notice of Violation, even if the alleged violation was of such a minor nature that Goldberg would not have otherwise pursued the alleged violation if it had occurred on the property of a discharger other than Squaw Valley. Livak stated that Goldberg informed him that the only way to avoid citing Squaw Valley for one particular violation would be

for Goldberg to "have a discussion with [Singer] and see if perhaps [Goldberg] would be permitted not to write that No-, tice of Violation, though [Goldberg] didn't hold much hope out for that because he was quite certain [Singer] would direct him to write that Notice of Violation."

Squaw Valley offers no evidence that its problems with Goldberg arose from anything other than a disagreement over his regulatory practice. While Squaw Valley argues that there is no requirement that personal animus must arise outside of the regulatory relationship, it is not enough for Squaw Valley employees to testify that they did not like Goldberg's enforcement methods. At a minimum, to prevail, Squaw Valley must show that Goldberg's conduct was motivated by animus. This it has not done. In contrast to Singer, who seems to harbor a personal animosity toward Wendt, Wendt characterized her interaction with Goldberg as brief, consisting of "hello, good-bye, that type of thing." Moreover, Squaw Valley has offered no other evidence that Goldberg made his regulatory decisions based on personal animosity toward Squaw Valley or its employees.

Squaw Valley's reliance on *Duran v. City of Douglas*, 904 F.2d 1372 (9th Cir. 1990) does not disprove that impermissible animosity must be the cause of disparate treatment. In *Duran,* the court reversed a grant of qualified immunity and stated that the police "may not exercise the awesome power at their disposal to punish individuals for conduct that is not merely lawful, but protected by the First Amendment." *Id.* at 1378. The *Duran* court did not come close to stating that an equal protection violation may be premised on animosity arising from a regulator's legal enforcement methods.

In sum, with regard to Squaw Valley's "class of one" equal protection claim, we reverse the grant of summary judgment in favor of Singer, and affirm the grant of summary judgment in favor of Goldberg.

## II. Substantive Due Process Claim

" '[T]he touchstone of due process is protection of the individual against arbitrary action of government.' " *County of Sacramento v. Lewis*, 523 U.S. 833, 845, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998) (quoting *Wolff v. McDonnell*, 418 U.S. 539, 558, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974)). The substantive component of the Due Process Clause "forbids the government from depriving a person of life, liberty, or property in such a way that 'shocks the conscience' or 'interferes with rights implicit in the concept of ordered liberty.' " *Nunez v. City of Los Angeles*, 147 F.3d 867, 871 (9th Cir.1998) (quoting *United States v. Salerno*, 481 U.S. 739, 746, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987)); *Daniels v. Williams*, 474 U.S. 327, 331, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986) (explaining that substantive due process protects against government power arbitrarily and oppressively exercised).

### A. Deprivation of Life, Liberty, or Property

As a threshold matter, "[t]o establish a substantive due process claim a plaintiff must ... show a government deprivation of life, liberty, or property." *Nunez*, 147 F.3d at 871; *see City of Cuyahoga Falls v. Buckeye Cmty. Hope Found.*, 538 U.S. 188, 198, 123 S.Ct. 1389, 155 L.Ed.2d 349 (2003) (noting threshold requirement of identifying property interest).

Neither the parties nor the district court identify whether the alleged conduct constitutes a deprivation of life, liberty, or property. Rather, they all seem to assume that there is a general liberty interest to be free of arbitrary and capricious

government action. However, in *Nunez,* we explicitly held that "[t]here is no general liberty interest in being free from capricious government action." *Nunez,* 147 F.3d. at 873; *see City of Cuyahoga Falls,* 538 U.S. at 200, 123 S.Ct. 1389 (Scalia, J., concurring) ("Those who claim 'arbitrary' deprivations of non-fundamental liberty interests must look to the Equal Protection Clause.").

Nevertheless, we have recognized a constitutionally "protected property interest" in a landowner's right to " 'devote [his] land to any legitimate use.' " *Harris v. County of Riverside,* 904 F.2d 497, 503 (9th Cir.1990) (quoting *Washington ex rel. Seattle Title Trust Co. v. Roberge,* 278 U.S. 116, 121, 49 S.Ct. 50, 73 L.Ed. 210 (1928)). Here, presumably, the alleged overzealous and selective regulation of Squaw Valley interferes with its use of its real property.[6]

**B.  Preemption by Takings Clause**

We have held that substantive due process claims based on governmental interference with property rights are foreclosed by the Fifth Amendment's Takings Clause. *See Madison v. Graham,* 316 F.3d 867, 871 (9th Cir.2002). In *Armendariz,* we recognized that "the use of substantive due process to extend constitutional protection to economic and property rights .has been largely discredited." *Armendariz,* 75 F.3d

at 1318–19. Applying *Graham v. Connor,* 490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989), we overruled prior circuit precedent that would have permitted a plaintiff in a land use case to bring both a substantive due process claim and a takings claim based on the same facts. *Armendariz,* 75 F.3d at 1324–26. We made clear that the prohibition extends even to claims that would be unsuccessful takings claims. *Id.* at 1325–26 ("Substantive due process analysis has no place in contexts already addressed by explicit textual provisions of constitutional protection, regardless of whether the plaintiff's potential claims under those amendments have merit.").

Since deciding *Armendariz,* we have consistently precluded substantive due process claims based on a deprivation of property addressed by the Takings Clause. *See Madison,* 316 F.3d at 870–71. The blanket prohibition applies even to a disguised takings claim. As we have explained, landowners "cannot sidestep *Armendariz* by re-characterizing their claim as lying solely in substantive due process." *Macri v. King County,* 126 F.3d 1125, 1129 (9th Cir.1997); *see Buckles v. King County,* 191 F.3d 1127, 1137 (9th Cir.1999) (precluding a substantive due process claim based on "spot zoning" and explaining that

---

**6.** Specifically, Squaw Valley contends its substantive due process rights were violated when: (1) Singer removed Peacock and replaced him with the inexperienced Goldberg; (2) Singer directed Goldberg to note every possible regulatory violation, even if the violation was minor and would not be noted if done by another discharger; (3) Goldberg noted nearly twice as many violations in his first year overseeing Squaw Valley than Peacock had noted in the previous 10 years; (4) Goldberg noted multiple violations without taking enforcement steps and without notifying Squaw Valley of the alleged problems; (5) Singer and Goldberg "intentionally noted but concealed a number of purported violations"

to magnify Squaw Valley's alleged wrongdoing to secure a referral by the Lahontan Board to the Attorney General; (6) Singer changed the interpretation of the turbidity standard from "above background" to "absolute" when he knew that this interpretation lacked any scientific basis; (7) Singer and Goldberg enforced the "absolute" turbidity standard so that it became impossible for Squaw Valley to meet it; (8) Goldberg permitted "a federal search warrant to issue based upon evidence he kn[ew] to be false" or "invalid"; and (9) Singer and Goldberg "lied" to the Lahontan Board to secure a punitive referral to the Attorney General.

"[c]hanging the label will not change the result").[7]

■ Even assuming that some room remains for substantive due process claims in the context of deprivations of property, Squaw Valley's claim would be preempted. The Supreme Court has repeatedly observed that land use restrictions that do not " 'substantially advance legitimate state interests' " or " 'den[y] an owner economically viable use of his land' " effect a taking. *Macri*, 126 F.3d at 1129 (citing *Agins v. City of Tiburon*, 447 U.S. 255, 260, 100 S.Ct. 2138, 65 L.Ed.2d 106 (1980); *Nollan v. Cal. Coastal Comm'n*, 483 U.S. 825, 834, 107 S.Ct. 3141, 97 L.Ed.2d 677 (1987); *Dolan v. City of Tigard*, 512 U.S. 374, 383–85, 114 S.Ct. 2309, 129 L.Ed.2d 304 (1994)).

In *Weinberg v. Whatcom County*, 241 F.3d 746 (9th Cir.2001), we considered a dispute over the landowners' right to remove vegetation and place fill material in a buffer area. *Id.* at 749. The county issued stop work orders, imposed a six-year development moratorium, and fined the landowners. *Id.* Citing *Armendariz*, we declined to address the landowners' substantive due process claims. *Id.* at 749 n. 1. Nevertheless, we affirmed summary judgment on the landowners' takings claim because of a lack of evidence that "the regulatory action caused deprivation of all economic use." *Id.* at 752.

Here, Squaw Valley argues that Singer and Goldberg subjected it "to a tyrannical regime of regulatory abuse designed to drive the resort out of business." Moreover, Singer and Goldberg's regulatory conduct—including their interpretation and enforcement of the turbidity objective, and selective and overzealous enforcement—restricts Squaw Valley's economic use of its property and allegedly does not advance the state's interest in protecting water quality. Accordingly, Squaw Valley was required to proceed under the Takings Clause, even if its takings claim would have been unsuccessful.

This appeal is before us on the grant of a summary judgment motion based on qualified immunity. While it is doubtful that Squaw Valley has established a substantive due process violation, even if it has, the contours of substantive due process in the context of regulating use of real property—to the extent such a claim is still viable in this circuit—remain imprecise, *i.e.*, not clearly established. Accordingly, we affirm the grant of summary judgment in favor of Singer and Goldberg on these claims because Squaw Valley has not raised a triable issue of material fact regarding the violation of a clearly established substantive due process right.

## CONCLUSION

For the foregoing reasons, we reverse the grant of summary judgment on Squaw Valley's "class of one" equal protection claim against Singer, but affirm it as to all other claims, *i.e.*, the equal protection claim against Goldberg and the substantive due process claims against both Singer and Goldberg. Each party shall bear his or its own costs on appeal.

---

**7.** The parties have not cited to any post-*Armendariz* case, and our research has revealed none, where this Circuit upheld a substantive due process claim based on a deprivation of real property. In fact, the cases Squaw Valley principally relies on *support* the contention that a substantive due process claim based on the regulation of real property is precluded by the Takings Clause. *See Sinaloa Lake Owners Ass'n v. City of Simi Valley*, 882 F.2d 1398, 1407 (9th Cir.1989), *overruled by Armendariz*, 75 F.3d at 1326; *Patel*, 103 F.3d at 874–75 (relying on *Armendariz* to preclude substantive due process claim).

AFFIRMED in part, REVERSED in part, and REMANDED.