**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

| | |
|---|---|
| EDDIE L. FORD, *Plaintiff-Appellant*, <br><br> v. <br><br> CITY OF YAKIMA; N. WENTZ, Lieutenant; R. URLACHER, Officer, *Defendants-Appellees*. | No. 11-35319 <br><br> D.C. No. 2:09-CV-03108-LRS <br><br><br> OPINION |

Appeal from the United States District Court
for the Eastern District of Washington
Lonny R. Suko, District Judge, Presiding

Argued and Submitted
April 11, 2012—Seattle, Washington

Filed February 8, 2013

Before: Proctor Hug, Jr., Dorothy W. Nelson, and
Consuelo M. Callahan, Circuit Judges.

Per Curiam Opinion;
Dissent by Judge Callahan

## SUMMARY[*]

### Civil Rights

The panel reversed the district court's summary judgment in favor of the City of Yakima and two of its police officers in a 42 U.S.C. § 1983 action in which plaintiff alleged that the officers retaliated against him for exercising his First Amendment right to freedom of speech.

The panel held that plaintiff alleged facts, that officers booked and jailed him in retaliation for his protected speech, which established a violation of his clearly established First Amendment right to be free from police action motivated by retaliatory animus, even if probable cause existed for the officers initially to arrest plaintiff for violating the City noise ordinance. The panel concluded that at the time of plaintiff's arrest, a reasonable police officer would have understood that he could not exercise his discretion to book an individual in retaliation for that individual's First Amendment activity. The panel therefore determined that officers were not entitled to qualified immunity, and plaintiff's claims should proceed to trial.

Dissenting, Judge Callahan stated that the majority's opinion failed to follow Supreme Court guidance in determining first that the police officers' decision to book plaintiff instead of issuing a ticket violated his constitutional rights, and second that plaintiff's "right" was clearly established.

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

**COUNSEL**

William D. Pickett (argued), Law Office of William D. Pickett, Yakima, Washington, for Plaintiff-Appellant.

Thomas P. Miller (argued), Robert L. Christie, Christie Law Group, PLLC, Seattle, Washington, for Defendants-Appellees.

**OPINION**

PER CURIAM:

Eddie Ford ("Ford") appeals from the grant of summary judgment in favor of the City of Yakima and two of its police officers, Ryan Urlacher and Nolan Wentz ("Appellees"), in his 42 U.S.C. § 1983 action alleging First Amendment retaliation.

Ford has alleged facts that would establish a violation of his clearly established First Amendment right to be free from police action motivated by retaliatory animus, even if probable cause existed for that action. *See Skoog v. County of Clackamas*, 469 F.3d 1221, 1235 (9th Cir. 2006). Because the officers are not entitled to qualified immunity, we reverse and remand for trial.

## I.  Background

Shortly after midnight on July 17, 2007, Ford was listening to music while driving to work when he noticed a police car approaching rapidly from behind him. Ford changed lanes twice "to get out of [the police car's] way."

The patrol car followed him each time. While stopped at a red light, Ford stepped out of his car abruptly and asked Urlacher, the officer driving the police car, why he was being followed so closely. Urlacher felt "concerned for [his] safety," and told Ford to get back into the car and "go." Then, as both parties drove through the intersection, Urlacher turned on his flashing lights and initiated a traffic stop.

Ford turned into a nearby parking area and emerged from his car yelling. Urlacher, armed with a taser gun, approached Ford and asked for his license and registration. Urlacher perceived the situation as "very dangerous." As Ford retrieved the requested items, he stated that he thought the traffic stop was racially motivated. Urlacher warned Ford to stay in the car or risk being taken to jail. Ford obeyed.

Urlacher then returned to his patrol car and checked Ford's driver's license for warrants. While doing so, he told another officer, "I think I'm going to arrest him for [a] city noise ordinance violation right now. He might only get a ticket if he cooperates. But with that attitude, he's going to get cuffed." The officer then returned to Ford's car and, with the assistance of a backup officer, handcuffed Ford.

An exchange then ensued in which Urlacher stated: 1) "Stop running the mouth and listen"; 2) "If you talk over me, you are going to go to jail, sir. Do not talk over me"; 3) "If you cooperate, I may let you go with a ticket today. If you run your mouth, I will book you in jail for it. Yes, I will, and I will tow your car"; 4) "If you cooperate and shut your mouth, I'll give you a ticket and you can go."

Ford responded with disbelief to the prospect of being taken to jail for a noise violation, but after repeated threats

that he would be jailed if he kept talking, Ford stopped yelling and answered the officer's questions with responses such as "Uh-huh" and "You do what you want." When Ford expressed concern about getting to work, Urlacher replied:

> Well that's not going to happen if you don't—if you keep running your mouth. Okay? If you have diarrhea of the mouth, you will go to jail. If you cooperate with us and treat us like human beings, we will treat you like a human being. Do you understand me?

Ford said nothing further.

Once Ford was in the back of Urlacher's patrol car and out of earshot, Urlacher told a backup officer, "I don't know if I'm going to book him yet. I'll see if he's going to shut up." At that point, Lieutenant Wentz arrived on the scene. Urlacher recounted the incident to Wentz and explained, "So he's under arrest for the city ordinance right now. If he shuts up, I'll let him go with a ticket." Wentz stated that Ford had a "hot head" and was "getting worse over time." Wentz advised, "I would not just write [Ford] a ticket and let him go . . . I'd sign his ass up." Urlacher agreed and took Ford to jail.

When driving to the booking facility, Ford asked why he was being taken to jail. Urlacher told him that it was because he was playing his music too loud and because he "acted a fool." Urlacher elaborated:

> If you would have acted like a human being towards me, I would have treated you like a human being. I probably would have, you

know — but you talked yourself into this on video. It's all well recorded.

Ford invoked his right to free speech. Urlacher replied:

I have the freedom to take you to jail, too. And that's what's going to happen. . . . You exercise [your freedom of speech] all you want, okay? If you just cooperate and treat the police like humans, we'll treat you like that. But when you act like that, like an animal, you've got to get treated that way, you know.

You're going to jail for numerous reasons. The crime you're going to jail for is the city noise ordinance. A lot of times we tend to cite and release people for that or we give warnings. However . . . you acted a fool . . . and we have discretion whether we can book or release you. *You talked yourself—your mouth and your attitude talked you into jail. Yes, it did.*

Urlacher later testified that he booked Ford (1) because he violated the city noise ordinance, which gives him discretion to book a person "if I feel like it," and (2) because he "failed to listen[,] . . . failed to act civil, . . . failed to take responsibility for his actions, [and because of] his rageful [and disrespectful] behavior towards the law enforcement," which put public safety at risk.

Ford was prosecuted for violating the City of Yakima's noise ordinance. Yakima Municipal Code 6.04.180. The municipal court acquitted Ford of the charged offense.

Ford filed an action for civil damages against Appellees pursuant to 42 U.S.C. § 1983. Ford alleged, *inter alia*, that the police officers retaliated against him for exercising his First Amendment right to freedom of speech. Appellees moved for summary judgment on all claims. Ford moved for partial summary judgment against the officers, alleging that qualified immunity did not shield them from liability.

The district court granted summary judgment to Appellees and denied Ford's motion for partial summary judgment. In so doing, the court found that the officers did not retaliate against Ford in violation of the First Amendment because they had probable cause to arrest Ford for violating the city noise ordinance. In addition, "the totality of the circumstances, including the manner in which [Ford] confronted Officer Urlacher and delivered his criticism, and not merely the criticism itself, led Officer Urlacher to reasonably conclude booking was warranted." The district court determined that "no rational jury could conclude Plaintiff's exercise of his right of free speech was the 'but for cause' of his booking." Because the court ruled as a matter of law that there was no constitutional violation, it did not reach the issue of qualified immunity.

Ford appeals the district court's grant of summary judgment in favor of the officers on his First Amendment claim.

## II. Jurisdiction and Standard of Review

We have jurisdiction pursuant to 28 U.S.C. § 1291. We review de novo a district court's ruling on cross-motions for summary judgment, including rulings based on qualified immunity. *CRM Collateral II, Inc. v. TriCounty Metro. Transp. Dist.*, 669 F.3d 963, 968 (9th Cir. 2012). "We view the evidence in the light most favorable to the nonmoving party and determine whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law." *Id*. at 968 (internal quotation marks and citation omitted). The parties' assertions that there are no disputed issues "does not vitiate the court's responsibility to determine whether disputed issues of material fact are present. A summary judgment cannot be granted if a genuine issue as to any material fact exists." *Fair Hous. Council v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001) (quoting *United States v. Fred A. Arnold, Inc.*, 573 F.2d 605, 606 (9th Cir.1978)).

## III. Discussion

Qualified immunity protects officers from liability for civil damages where their alleged unconstitutional conduct does not violate a clearly established right. *Hope v. Pelzer*, 536 U.S. 730, 739 (2002). "Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).

An officer is entitled to qualified immunity unless (1) facts viewed in the light most favorable to the injured party

show that the officer violated a constitutional right and (2) the right was clearly established at the time of the alleged misconduct. *Saucier v. Katz*, 533 U.S. 194, 201 (2001), *modified by Pearson*, 555 U.S. at 233.

## A. Constitutional Violation

The first issue is whether the facts viewed in the light most favorable to Ford show a violation of his rights. "[T]he First Amendment protects a significant amount of verbal criticism and challenge directed at police officers." *City of Houston v. Hill*, 482 U.S. 451, 461 (1987). While an individual's critical comments may be "provocative and challenging," they are "nevertheless protected against censorship or punishment, unless shown likely to produce a clear and present danger of a serious substantive evil that rises far above public inconvenience, annoyance, or unrest." *Id*. (quoting *Terminiello v. City of Chicago*, 337 U.S. 1, 4 (1949)). In fact, "[t]he freedom of individuals verbally to oppose or challenge police action without thereby risking arrest is one of the principal characteristics by which we distinguish a free nation from a police state." *Id*. at 462–63.

In this Circuit, an individual has a right "to be free from police action motivated by retaliatory animus but for which there was probable cause." *Skoog*, 469 F.3d at 1235. That right was violated when the officers booked and jailed Ford in retaliation for his protected speech, even though probable cause existed for his initial arrest. Ford's criticism of the police for what he perceived to be an unlawful and racially motivated traffic stop falls "squarely within the protective umbrella of the First Amendment and any action to punish or deter such speech . . . is categorically prohibited by the

Constitution." *Duran v. City of Douglas*, 904 F.2d 1372, 1378 (9th Cir. 1990).[1]

In order to establish a claim of retaliation in violation of the First Amendment, Ford's evidence must demonstrate that the officers' conduct would chill a person of ordinary firmness from future First Amendment activity. *See Skoog*, 469 F.3d at 1231–32. In addition, the evidence must enable Ford ultimately to prove that the officers' desire to chill his speech was a but-for cause of their allegedly unlawful conduct. *See Lacey v. Maricopa County*, 693 F.3d 896, 916–17 (9th Cir. 2012) (en banc).

---

[1] The dissent premises its view in part on the argument that individuals detained by the police enjoy less First Amendment protection than nondetainees. Dissent at 19–20 (citing cases that discuss the diminished constitutional rights of prison inmates and jailed arrestees). Even if we believed that the law supported such a view, which we empathically do not, the facts here make it doubtful that Ford's ostensibly attenuated rights would be relevant to the officers' liability. Although the dissent does not describe with specificity which constitutional rights are abrogated and which are retained when the police detain someone on a public street, it offers some hints. For instance, the dissent suggests that the detainee's rights might need to give way to "the officer's need to determine [the detainee's] dangerousness and proclivity to commit further breaches of the peace." Dissent at 21. But nothing that Ford said following his detention gave any indication that he posed a danger to himself, the officers or property, or that he was likely to further disturb the peace. The dissent additionally proposes that the First Amendment's scope is narrowed, in the context of a detention, by the fact that officers are "required to consider some statements by a detained person such as those relating to medical condition, health, fear of assault from others, and threats." Dissent at 33. The record makes plain, however, that nothing Ford said related to any of these things. And to the extent that there are any disputed issues of fact regarding the content of Ford's statements, or the relationship between those statements and the officers' alleged retaliatory animus, their resolution is for the trier of fact.

### 1. Chilled Speech

Ford has set forth sufficient evidence to demonstrate that the officer's "acts would chill or silence a person of ordinary firmness from future First Amendment activities." *Mendocino Envtl. Ctr. v. Mendocino Cnty.*, 192 F.3d 1283, 1300 (9th Cir. 1999) (citation omitted). He has alleged that he was booked and jailed in retaliation for his speech. This Court has recognized that a retaliatory police action such as an arrest or search and seizure would chill a person of ordinary firmness from engaging in future First Amendment activity. *See Lacey*, 693 F.3d at 917 (retaliatory arrest); *Skoog*, 469 F.3d at 1232 (retaliatory search and seizure); *see also White v. Lee*, 227 F.3d 1214, 1228 (9th Cir. 2000) (holding that informal measures such as an investigation can chill First Amendment activities). Likewise, a person of ordinary firmness would be chilled from future exercise of his First Amendment rights if he were booked and taken to jail in retaliation for his speech. Therefore, a rational jury could find that the officers deterred or chilled the future exercise of Ford's First Amendment rights.

### 2. Causation

To satisfy the second requirement, the evidence must be sufficient to establish that the officers' desire to chill Ford's speech was a but-for cause of their conduct. In other words, would Ford have been booked and jailed, rather than cited and arrested, but for the officers' desire to punish Ford for his speech?

Under Washington law, a police officer who has probable cause may arrest an individual without a warrant if that individual commits a misdemeanor in the presence of that

officer.  RCW 10.31.100.  When a person is arrested for a traffic violation, the arresting officer may not detain him for a period of time longer than is necessary to issue and serve a citation and a notice to appear in court.  RCW 46.64.015. Upon arresting an individual for a misdemeanor, a police officer has discretion under Washington Criminal Rules for Courts of Limited Jurisdiction ("CrRLJ") to hold an individual in custody based on a limited number of factors, including "whether detention appears reasonably necessary to prevent imminent bodily harm to [the individual] or another, or injury to property, or breach of the peace."  CrRLJ 2.1(b)(2)(ii).

Ford does not contend that police officers lacked probable cause to arrest him for violating the city noise ordinance.  But Officer Urlacher's probable cause to arrest Ford does not necessarily mean that booking and jailing him was constitutional.[2]  The only permissible non-retaliatory bases on which Officer Urlacher may have booked Ford are contained in CrRLJ 2.1(b)(2), and the officers have argued and presented evidence that their decision to book and jail Ford was based on that provision.

---

[2] Probable cause is not irrelevant to an individual's claim that he was booked and jailed in retaliation for his speech.  Probable cause for the initial arrest can be evidence of a police officer's lack of retaliatory animus for subsequently booking and jailing an individual.  *See Dietrich v. John Ascuaga's Nugget*, 548 F.3d 892, 901 (9th Cir. 2008) (holding that the issue of probable cause is not dispositive of ordinary retaliation claims, though it still has "high probative force") (alteration and quotation marks omitted).  However, that determination should be left to the trier of fact once a plaintiff has produced evidence that the officer's conduct was motivated by retaliatory animus.

While the issue of causation ultimately should be determined by a trier of fact, Ford has provided sufficient evidence for a jury to find that the officers' retaliatory motive was a but-for cause of their action, thus satisfying the causation element of a First Amendment retaliation claim for the purposes of qualified immunity.[3] *Cf. Duran*, 904 F.2d at 1378 (finding summary judgment inappropriate where the officer admitted to stopping the plaintiff because the plaintiff made obscene gestures and yelled profanities but claimed he had no retaliatory motive because he honestly believed criminal activity might be afoot); *Mendocino Envt'l Ctr.*, 192 F.3d at 1303 ("The possibility that other inferences could be drawn [regarding officers' motivations] that would provide an alternate explanation for the appellants' actions does not entitle them to summary judgment."). Taken in the light most favorable to Ford, the facts establish that the officers' alleged conduct violated his right to be free from police action motivated by retaliatory animus, even if probable cause existed for that action.

---

[3] In considering causation, the dissent asks whether "the officer's statements to Ford truly intended to punish Ford for his comments" or, if, instead, they were "efforts to elicit a changed perspective on Ford's part that would allow the officers to release Ford." Dissent at 25. The dissent offers the possibility that "[s]everal of the officer's comments . . . can be interpreted as indicating that the officer sought to give Ford an opportunity to change his attitude," making causation "problematic." Dissent at 25–26. We are not persuaded by this nuanced view of the officer's statements. Police officers are authority figures. Accordingly, there is little practical difference between officers "punishing" Ford for his speech and providing Ford an "opportunity" to conform his views to those of the police in order to avoid arrest. And even if that were a meaningful distinction, the question whether the officers retaliated against Ford or simply permitted him to retreat voluntarily from his *lèse-majesté* is ultimately a factual one that would have to be resolved at trial.

## B. Clearly Established Right

The officers are nevertheless entitled to qualified immunity if Ford's right was not clearly established when the officers booked and jailed him.

Whether a right is clearly established for the purposes of qualified immunity "depends substantially upon the level of generality at which the relevant 'legal rule' is to be identified." *Anderson v. Creighton*, 483 U.S. 635, 639 (1987). The right must not be stated as a broad general proposition, but rather must be defined with enough specificity to put a reasonable officer on notice that his conduct is unlawful. *Reichle v. Howards*, 132 S. Ct. 2088, 2093–94 (2012); *cf. Hope*, 536 U.S. at 741 (holding that "general statements of the law are not inherently incapable of giving fair and clear warning" to officers even where their specific conduct has not previously been held unlawful) (quoting *United States v. Lanier*, 520 U.S. 259, 271 (1997)). A right can be clearly established despite a lack of factually analogous preexisting case law, and officers can be on notice that their conduct is unlawful even in novel factual circumstances. *See Karl v. City of Mountlake Terrace*, 678 F.3d 1062, 1073 (9th Cir. 2012). The relevant inquiry is whether, at the time of the officers' action, the state of the law gave the officers fair warning that their conduct was unconstitutional. *Hope*, 536 U.S. at 741. We must assess the legal rule "in light of the specific context of the case, not as a broad general proposition." *Saucier*, 533 U.S. at 201.

At the time the officers acted in 2007, the law in this Circuit gave fair notice that it would be unlawful to jail Ford in retaliation for his First Amendment activity. Police officers have been on notice at least since 1990 that it is

unlawful to use their authority to retaliate against individuals for their protected speech. *See Duran*, 904 F.2d at 1375–78 (holding that a police officer's traffic stop and subsequent arrest of an individual who directed obscene gestures and words toward that officer was unlawful because it was well-established that police officers may not exercise their authority for personal motives, especially in response to an individual's criticism or insults); *see also Beck v. City of Upland*, 527 F.3d 853, 871 (9th Cir. 2008) (holding that *Duran* clearly established that police officers could not use their power to retaliate against an individual for his free speech). Moreover, this Court's 2006 decision in *Skoog* established that an individual has a right to be free from retaliatory police action, even if probable cause existed for that action. 469 F.3d at 1235. In that case, Skoog claimed that a police officer seized his property to retaliate against his filing a lawsuit against another officer. *Id.* at 1227. We held that although the officer's search and seizure was supported by probable cause, it was unlawful because the officer's primary motivation was to retaliate against Skoog's exercise of his First Amendment rights. *Id.* at 1235.

Thus, *Duran* clearly established that police officers may not use their authority to punish an individual for exercising his First Amendment rights, while *Skoog* clearly established that a police action motivated by retaliatory animus was unlawful, even if probable cause existed for that action. The officers' conduct in this case falls squarely within the prohibitions of *Duran* and *Skoog*. While the precise issue of retaliatory booking and jailing has not been addressed in this Circuit, "closely analogous preexisting case law is not required to show that a right was clearly established." *Robinson v. York*, 566 F.3d 817, 826 (9th Cir. 2009) (citation omitted). *Duran* addressed a retaliatory arrest and *Skoog*

applied to a retaliatory search and seizure, but the unlawfulness of a retaliatory booking and jailing was nevertheless apparent from those cases. After *Duran*, any reasonable police officer would have known that it was unlawful to use his authority to retaliate against an individual because of his speech. Likewise, any reasonable police officer would have understood that *Skoog*'s prohibition on retaliatory police action extended to typical police actions such as booking and jailing. Therefore, this case involved the kind of "mere application of settled law to a new factual permutation" in which we assume an officer had notice that his conduct was unlawful. *See Eng v. Cooley*, 552 F.3d 1062, 1076 (9th Cir. 2009) (quoting *Porter v. Bowen*, 496 F.3d 1009, 1026 (9th Cir. 2007)).

A reasonable officer would have understood that he did not automatically possess the authority to book and jail an individual upon conducting a lawful arrest supported by probable cause. Washington law clearly enumerates the limited factors that would allow a police officer to book and jail an individual who has been arrested for a misdemeanor. CrRLJ 2.1(b)(2). A reasonable officer would have been aware of the law governing his ability to book and jail an individual he lawfully has arrested. Moreover, a reasonable officer would have been aware that Washington law explicitly states that its rules "shall not be construed to affect or derogate from the constitutional rights of any defendant." CrRLJ 1.1. Thus, a reasonable police officer would have understood that he could not exercise his discretion to book an individual in retaliation for that individual's First Amendment activity. Finally, Officer Urlacher's statements indicate that he was, in fact, aware of his discretion to book an individual he has arrested: "I have the freedom to take you to jail . . . we have discretion whether we can book or release

you." He surely was aware that his discretion was subject to constitutional limits. Because the law concerning the right in question was clearly established at the time of Ford's arrest, the officers are not entitled to qualified immunity.

## IV.  Conclusion

Ford has put forth facts sufficient to allege a violation of his clearly established First Amendment right to be free from police action motivated by retaliatory animus, even if probable cause existed for that action. Thus, the officers are not entitled to qualified immunity, and Ford's claims should proceed to trial.

**REVERSED and REMANDED.**

---

CALLAHAN, Circuit Judge, dissenting:

I dissent because the majority's opinion fails to follow Supreme Court guidance in determining first that the police officers' decision to book Ford instead of issuing a ticket violated his constitutional rights, and second that Ford's "right" was clearly established. On the first point, the majority fails to appreciate that the scope of a person's right to speech is different after he or she has been detained. This leads to the majority's failure to discern that our prior cases on retaliatory police action, even if not cabined by subsequent Supreme Court decisions, do not create a clearly established right forbidding an officer from considering the comments of a legally detained individual when determining whether to book the individual.

## I.  Introduction

This case raises an issue of first impression.  It is not a case of retaliatory arrest.  Nonetheless, our review is informed by cases suggesting that, in order to state a claim for retaliatory arrest, a plaintiff must show a lack of probable cause for the arrest.  *See Reichle v. Howards*, — U.S. —*, —*, 132 S. Ct. 2088, 2095 (2012) (noting that evidence of probable cause "could be thought similarly fatal to a plaintiff's claim that animus caused his arrest, given that retaliatory arrest cases also present a tenuous causal connection between the defendant's alleged animus and the plaintiff's injury").  *But see Skoog v. Cnty. of Clackamas*, 469 F.3d 1221, 1232 (9th Cir. 2006) (noting "that a plaintiff need not plead the absence of probable cause in order to state a claim for retaliation").  The police had probable cause to arrest Ford for violating the city noise ordinance and he does not argue otherwise.  *See* Majority at 12.  Also, although Ford was prosecuted in the Yakima Municipal Court for violating the city noise ordinance and found not guilty of the charges, he does not assert a claim of retaliatory prosecution.  *See Hartman v. Moore*, 547 U.S. 250, 266–67 (2006) (holding that a plaintiff must show a lack of probable cause to state a claim for retaliatory prosecution).  Instead, Ford seeks monetary damages in an action under 42 U.S.C. § 1983 based on the assertion that the police officers violated his constitutional rights when, after detaining him for violating the city noise ordinance, they decided to book him based, in part, on his post-detention statements, rather than just issuing a ticket.

Ford's asserted claim of a violation of his constitutional rights, and the majority's treatment of it, raises several major concerns.  Initially and critically, the majority assumes,

incorrectly, that Ford's arrest did not affect the scope of his First Amendment right to free speech. Consequently, the majority fails to appreciate that a plaintiff asserting that he was booked instead of ticketed in retaliation for his post-detention statements must show a lack of probable cause for his booking. Here, this prerequisite for relief bars Ford from prevailing for two reasons. First, he has not claimed that the officers lacked probable cause to book him. Second, the district court's unchallenged determination that Ford's exercise of his right of free speech was not the but-for cause of his booking establishes that there was probable cause to book Ford.

## II. Ford Has Not Shown A Violation of His First Amendment Rights

### A. Lawful Detention Curtails An Individual's Rights Under the First Amendment

I agree with the majority that the "First Amendment protects a significant amount of verbal criticism and challenge directed at police officers," *City of Houston v. Hill*, 482 U.S. 451, 461 (1987), and that police officers "must respect the right of individuals in [the] community to question their government and the role of the police," *Mackinney v. Nielsen*, 69 F.3d 1002, 1007 (9th Cir. 1995). However, here we are concerned not with speech that might give rise to an arrest, but with speech made after a person has been lawfully detained. This is a critical distinction. It is well settled that once an individual is lawfully detained, his or her rights may be restricted for legitimate penological and custodial reasons. *See Bell v. Wolfish*, 441 U.S. 520, 546 (1979) (stating that "[a] detainee simply does not possess the full range of

freedoms of an unincarcerated individual");[1] *see also Bull v. City & Cnty. of San Francisco*, 595 F.3d 964, (9th Cir. 2010) (en banc) (upholding strip searchers of arrestees). Obviously, a detained person is not free to leave. Similarly, a detained person's speech may be relevant to the restraints placed on him and his conditions of confinement. In other words, what a person says after he or she is lawfully detained may be, and perhaps must be, considered by police officers. Other than to state that it disagrees, the majority does not address this reality.

The scope of a detained person's First Amendment rights is particularly germane in the context of the defendant officers deciding whether to book or ticket Ford. Washington law provides that an officer making this decision should consider "whether detention appears reasonably necessary to prevent imminent bodily harm to himself, herself, or another, or injury to property, or breach of the peace." Wash. CrRLJ 2.1(b)(ii). This consideration appears to be constitutional and is eminently reasonable. We would not want a peace officer to release an individual when the officer has reason to believe that the individual will harm "himself, herself, or another, or [injure] property, or breach [] the peace." Moreover, among the most relevant evidence for such a determination will be

---

[1] The Supreme Court explained that although "prison inmates retain certain constitutional rights . . . [l]awful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system." *Bell*, 441 U.S. at 545–46 (internal quotation marks and citations omitted). The Court also commented that it had held "that even when an institutional restriction infringes a specific constitutional guarantee, such as the First Amendment, the practice must be evaluated in the light of the central objective of prison administration, safeguarding institutional security." *Id*. at 547.

the individual's statements.  Indeed, here the officer explained that his decision to detain Ford was based on Ford's "mouth and [his] attitude."  In explaining his decision to detain Ford, the officer cited concerns for public safety as well as Ford's failure to listen, failure to act civilly, failure to take responsibility for his actions, and disrespectful behavior toward law enforcement.  Thus, both as a matter of common sense and state law, the defendant officers were allowed to consider Ford's post-detention statements in deciding whether to ticket or book him.

**B.  Ford's Claim of Retaliation Based on His Post-Detention Statements Requires a Showing of the Absence of Probable Cause for the Booking**

The interplay between the officer's need to determine a detained person's dangerousness and proclivity to commit further breaches of peace, and the person's right to speech under the First Amendment, distinguishes this case from the cases the majority cites and directs how we should review Ford's allegations.  Skoog alleged that the defendants searched his office and seized materials in retaliation for Skoog having filed a lawsuit.  *Skoog*, 469 F.3d at 1227.  In *Duran v. City of Douglas*, 904 F.2d 1372 (9th Cir. 1990), the plaintiffs alleged that defendants had unlawfully arrested them based on one of them making obscene gestures at the police from their car.  *Id*. at 1374–75.  In *Lacey v. Maricopa County*, 693 F.3d 896 (9th Cir. 2012) (en banc), the plaintiff alleged that defendants violated his First Amendment rights by investigating and arresting him in retaliation for articles he published.  *Id*. at 916.  In each case, the actions taken against the plaintiffs were allegedly taken against them based on their exercising their rights as private citizens.  Thus, the statement in *Skoog*, 469 F.3d at 1235, that an individual has a right "to

be free from police action motivated by retaliatory animus but for which there was probable cause" did not purport to cover a situation where a defendant's constitutional rights are already circumscribed by his lawful detention.  Indeed, in *Duran* the court noted that there are "well-defined limits on what police officers may do in discharging their duties," and that "[p]erhaps the most fundamental of these is the requirement that the police not interfere with the freedom of private persons unless it be for specific, legitimate reasons." 904 F.3d at 1376.  Here, Ford's charges against the officers concern not interference "with the freedom of private persons," but rather the officers' reactions to Ford's comments after he was legally detained.

## 1.  Ford must show a lack of probable cause for his booking

Accordingly, Ford's case is analogous to the situation presented in *Reichle*, where the Supreme Court noted that "the right in question is not the general rule to be free from retaliation for one's speech, but the more specific right to be free from a retaliatory arrest that is otherwise supported by probable cause."  132 S. Ct. at 2094.  The Court held that it "has never held that there is such a right."  *Id.*  Similarly, Ford has no right not to be booked based on his post-detention statements where the booking is supported by probable cause.

In *Reichle*, the Court noted that evidence of probable cause "could be thought similarly fatal to a plaintiff's claim that animus caused his arrest, given that retaliatory arrest cases also present a tenuous causal connection between defendant's alleged animus and the plaintiff's injury."  *Id*. at 2095.  The Court commented:

An officer might bear animus toward the content of a suspect's speech. But the officer may decide to arrest the suspect because his speech provides evidence of a crime or suggests a potential threat . . . . Like retaliatory prosecution cases, then, the connection between alleged animus and injury may be weakened in the arrest context by a police officer's wholly legitimate consideration of speech.

*Id*. at 2095–96 (internal citation omitted). The Supreme Court expressed a preference for requiring the showing of the absence of probable cause and approvingly cited decisions by other circuit courts requiring a showing of a lack of probable cause.[2]  *Id*. at 2096.

---

[2] The Supreme Court noted that for qualified immunity purposes, "it was at least arguable" that *Hartman*'s rule requiring a lack of probable cause extended to retaliatory arrests. *Id*. at 2096. It then commented:

Decisions from other Federal Courts of Appeals in the wake of *Hartman* support this assessment. Shortly before Howards' arrest, the Sixth Circuit held that *Hartman* required a plaintiff alleging a retaliatory arrest to show that the defendant officer lacked probable cause. *See Barnes v. Wright*, 449 F.3d 709, 720 (2006) (reasoning that the *Hartman* "rule sweeps broadly"). That court's treatment of *Hartman* confirms that the inapplicability of *Hartman* to arrests would not have been clear to a reasonable officer when Howards was arrested. Moreover, since Howards' arrest, additional Courts of Appeals have concluded that *Hartman*'s no-probable-cause requirement extends to retaliatory arrests. *See, e.g.*, *McCabe v. Parker*, 608 F.3d 1068, 1075 (C.A.8 2010); *Phillips v. Irvin*, 222 Fed. Appx. 928, 929 (C.A.11 2007) (per curiam). As we have

Recognition of the officers' "wholly legitimate consideration of speech" by a lawfully detained individual, such as Ford, changes fundamentally the nature of a court's inquiry. Asking whether an officer's "acts would chill or silence a person of ordinary firmness from future First Amendment activities," Majority at 11 (quoting *Mendocino Envtl. Ctr. v. Mendocino Cnty.*, 192 F.3d 1283, 1300 (9th Cir. 1999)), assumes that a detained individual has a constitutional right to say whatever he wants while he is detained, without any adverse consequences. As shown, this is not true. Thus, the majority's application of *Mendocino* to this case ignores the crucial distinction between what an individual may be arrested for and the necessary consequences of statements by an individual after he has been detained.

Rather than focus on whether an officer's action had a chilling effect on the plaintiff, the proper inquiry under cases such as *Reichle* is whether the officer had probable cause to book the detained individual in light of his statements. In other words, did Ford's post-detention statements give the officers reason to believe that Ford might harm himself or others, injure property, or breach the peace?

In making this inquiry, we should keep in mind our statement in *Duran* that:

---

previously observed, "[i]f judges thus disagree on a constitutional question, it is unfair to subject police to money damages for picking the losing side of the controversy." *Wilson v. Layne*, 526 U.S. 603, 618 (1999).

*Reichle*, 132 S. Ct. at 2096 (parallel citations omitted).

A police officer's duties are both difficult and dangerous. Circumstances on the beat often require immediate action in order to prevent serious harm to persons or property; rarely is there time for brushing up on the Supreme Court's latest pronouncements on warrant requirements, probable cause or reasonable suspicion. Thus, police officers "generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). This is an objective standard, *Anderson v. Creighton*, 483 U.S. 635, 641 (1987), that leaves "ample room for mistaken judgments." *Malley v. Briggs*, 475 U.S. 335, 343 (1986).

904 F.2d at 1376 (parallel citations omitted).

Critically, as *Reichle* suggests, focusing on whether the officer had legitimate reasons under Washington law for booking Ford casts a different light on causation. Were the officer's statements to Ford truly intended to punish Ford for his comments, or were they efforts to elicit a changed perspective on Ford's part that would allow the officer to release Ford? Several of the officer's comments that the majority cites can be interpreted as indicating that the officer sought to give Ford an opportunity to change his attitude.[3] If

---

[3] For example, the majority notes that the officer stated: "He might only get a ticket if he cooperates. But with that attitude, he's going to get cuffed"; "I don't know if I'm going to book him yet. I'll see if he's going

the officer's motive was not to chill Ford's First Amendment rights, causation becomes problematic.[4]  In *Hartman*, the Supreme Court noted:

> It is clear, moreover, that the causation is understood to be but-for causation, without which the adverse action would not have been taken; we say that upon a prima facie showing of retaliatory harm, the burden shifts to the defendant official to demonstrate that even without the impetus to retaliate he would have taken the action complained of (such as firing the employee).  *See Mt. Healthy* [*City Sch. Dist. Bd. of Educ. v. Doyle*], 429 U.S. [274,] 287 [(1977)].  If there is a finding that retaliation was not the but-for cause of the discharge, the claim fails for lack of causal connection between unconstitutional motive and resulting harm, despite proof of some retaliatory animus in the official's mind.  *See ibid.*  It may be dishonorable to act with an unconstitutional motive and perhaps in some

---

to shut up"; and "If he shuts up, I'll let him go with a ticket."  Majority at 5.

[4] The majority takes issue with what it describes as this "nuanced view of the officer's statement."  Majority at 13 n.3.  It posits that there is little practical difference between an officer "punishing" Ford and providing him an "opportunity" to avoid detention.  I disagree.  Because the officer was required to consider Ford's post-detention statements in determining whether to book him, the officer should not be found liable in a § 1983 action unless there is a lack of probable cause for the detention and clearly established constitutional limitations on his consideration of Ford's statements.

> instances be unlawful, but action colored by some degree of bad motive does not amount to a constitutional tort if that action would have been taken anyway. *See Crawford-El* [*v. Britton*, 523 U.S. 574,] 593 [(1998)]; *Mt. Healthy*, *supra*, at 285–286.

547 U.S. at 260 (parallel citations omitted).

The need to establish causation, when coupled with the recognition that an officer's duties are "difficult and dangerous" and "often require immediate action," *Duran*, 904 F.2d at 1376, support requiring that a plaintiff plead and prove an absence of probable cause when claiming a retaliatory booking based on statements made *after he was lawfully detained*. Otherwise, officers may face lawsuits and liability for retaliation even when they have probable cause to book the detainee. If the officer has probable cause to book a detained individual based, in part, on the person's post-detention actions or statements, there is no causation; and thus, there is no cause of action for violation of a constitutional right. *See Hartman*, 547 U.S. at 260.

The reasons underlying the Supreme Court's opinion in *Reichle* also require a showing of a lack of probable cause in a § 1983 action based on the plaintiff's post-detention speech. Ford's claim of retaliation presents a "tenuous causal connection between the defendant's alleged animus and the plaintiff's injury" similar to that presented in retaliatory prosecution and arrest cases. First and foremost, *Reichle* concerned alleged retaliation based on the acts of a free private person, while Ford objects to the officers' reaction to his statements made while he was legally detained. In *Reichle*, the Supreme Court noted that "evidence of the

presence or absence of probable cause for the arrest will be available in virtually every retaliatory arrest case." *Id.* at 2095. However, this is not true where the allegation is that an officer violated a person's constitutional right by exercising the option of booking the individual rather than issuing a ticket. Unlike determinations of whether there is probable cause for an arrest or to prosecute, there usually is no reason to marshal the evidence supporting the officer's decision to detain rather than to ticket an individual until and unless the individual files a § 1983 action. Even where, as here, there is a video of the arrest and detention, this does not encompass all the information the officers received and considered in making their decision. Moreover, unlike probable cause for an arrest or for prosecution, for which there is considerable case law, there is little judicial guidance on how to evaluate an officer's decision to book a lawfully detained individual. Thus, requiring the pleading and proving of a lack of probable cause is necessary to shield officers from being second guessed in civil actions brought by those they lawfully detained. *See Messerschmidt v. Millender*, — U.S. —, —, 132 S. Ct. 1235, 1244–45 (2012) (stating that qualified immunity "protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known," should provide "government officials breathing room to make reasonable but mistaken judgments," and should protect "all but the plainly incompetent or those who knowingly violate the law").

2.  **Because the District Court found there was probable cause for booking Ford, it properly granted judgment for defendants.**

Even if Ford were not required to show a lack of probable cause for his booking, the district court's finding of probable cause – which the majority does not really address – supports, nay compels, the district court's grant of summary judgment for the officers. The district court on cross-motions for summary judgment determined that the totality of the circumstances led the officer "to reasonably conclude booking was warranted." The court concluded that the booking "was not retaliatory" and that "no rational jury could conclude [Ford's] exercise of his right of free speech was the 'but-for cause' of his booking."

Although the court in *Skoog* stated that "a plaintiff need not plead the absence of probable cause in order to state a claim for retaliation," 469 F.3d at 1232, it also stated that "Skoog must ultimately prove that Royster's desire to cause the chilling effect was a but-for cause of the defendant's action." *Id.* Thus, even if the statement in *Skoog* that a plaintiff need not plead the absence of probable cause survives the Supreme Court's statement in *Reichle* that it "has never recognized a First Amendment right to be free from a retaliatory arrest that is supported by probable cause," 132 S. Ct. at 2093, here, the district court's finding that the officers' "desire to cause the chilling effect" was *not* a "but-for cause" of Ford's booking terminates the case, even under *Skoog*.

Once the case was submitted to the district court on cross-motions for summary judgment, the facts were no longer "[t]aken in the light most favorable to Ford." Majority at 13.

Rather, the district court's finding of no "but-for cause" should be affirmed unless Ford can show that the findings are clearly erroneous. *See United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948); *see also United States v. Hinkson*, 585 F.3d 1247, 1260–61 (9th Cir. 2009) (en banc).[5]

## III. The Right Perceived By The Majority Is Not Clearly Established

Even if I were to agree with the majority that Ford had a constitutional right not to have the officers consider his comments while he was detained, which I do not, I could not agree that this right was "clearly established." That is to say, the officers were not on notice that deciding to book Ford based, in part, on his comments while detained, violated his rights under the First Amendment.

The Supreme Court has not been chary of reminding us that a clearly established right cannot be established at a high

---

[5] In *Hinkson*, we reiterated the Supreme Court's statement that "a finding is 'clearly erroneous' when, although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." 583 F.3d at 1260 (quoting *U.S. Gypsum*, 333 U.S. at 395). We further commented that:

> the scope of our review limits us to determining whether the trial court reached a decision that falls within any of the permissible choices the court could have made. In other words, the Supreme Court's precedent convinces us that any "definite and firm conviction" of the reviewing court must still include some measure of deference to the trial court's factual determinations.

*Id*. at 1261.

level of generality. In *Ashcroft v. al-Kidd*, 131 S. Ct. 2074 (2011), the Supreme Court specifically stated "We have repeatedly told courts – and the Ninth Circuit in particular – not to define clearly established law at a high level of generality." *Id*. at 2084 (internal citation omitted); *see also Brosseau v. Haugen*, 543 U.S. 194, 199 (2004) (per curiam) (concluding that the Ninth Circuit erred in defining the right at issue at "a high level of generality").

This is precisely what the majority does here. It takes *Skoog*, which concerns a retaliatory arrest based on a free private person's action, and applies it to an action alleging an unconstitutional booking based, in part, on the plaintiff's statements while legally detained. This stretched application of *Skoog* is inconsistent with the Supreme Court's caution that "[t]he general proposition . . . that an unreasonable search or seizure violates the Fourth Amendment is of little help in determining whether the violative nature of particular conduct is clearly established." *al-Kidd*, 131 S. Ct. at 2084. Furthermore, *Skoog*, which is not a Supreme Court opinion and was decided only eight months before Ford's detention, is itself equivocal as to what it "established." The court concluded that the right it found was not clearly established at the time of the search, and further commented that "[a]t some future point, this right will become clearly established in this Circuit." 469 F.3d at 1235. Thus, the extent to which *Skoog* itself clearly established a cause of action for alleged police retaliation despite the presence of probable cause for the officer's action is doubtful. The clarity of this rule is further muddied by the spirit, if not the holding, of the Supreme Court's subsequent opinion in *Reichle*, 132 S. Ct. 2088.

The test for determining that a right is clearly established requires much more.  The Supreme Court has explained:

> [C]learly established for purposes of qualified immunity means that [t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent.

*Wilson v. Layne*, 326 U.S. 603, 614–15 (1999) (internal quotation marks and citation omitted).  Here, while the officer's subjective intent is not controlling, it is clear that Officer Urlacher reasonably did not think that he was violating any of Ford's constitutional rights.[6]  More importantly, there is no "pre-existing law" to inform the officers that Ford, once detained, could not talk himself into jail.

The majority states that police officers have been on notice since 1990 that it is unlawful to use their authority to retaliate against individuals for their protected speech. Majority at 14–15.  But all of the cases on which the majority relies concerned actions to arrest or to search based on

---

[6] This conclusion is implicit in the officer's statement to Ford that "but you talked yourself into this on video.  It's all well recorded." *See* Majority at 6.

individuals actions as free private persons.[7] Had the officers initially detained Ford based on his speech, the majority's broad axiom might apply. But that is not what Ford alleges. He alleges only that the officers decided to book him instead of giving him a ticket based on what he said *after he was legally detained*. Moreover, as the majority recognizes, under Washington law, the officers were required to consider Ford's post-detention statements in determining whether to ticket or book him. The officers were aware of this requirement of Washington law and cited it as one of the reasons leading them to book Ford. *See* Majority at 12. The majority has not cited, nor am I aware of any, case law that addresses an officer's consideration of a detained individual's statements when determining whether to book the individual. Indeed, it seems self-evident that an officer is required to consider some statements by a detained person such as those relating to medical condition, health, fear of assault from others, and threats, in determining how to process the individual.[8]

---

[7] As previously noted, in *Duran*, 904 F.2d 1372, the plaintiffs were arrested after one of them made obscene gestures at the police from their car. *Id*. at 1374–75. In *Beck v. City of Upland*, 527 F.3d 853 (9th Cir. 2008), the plaintiff alleged that he was arrested because of his protected speech challenging his treatment by the city. *Id*. at 856–57. Neither of these cases, nor *Skoog*, 469 F.3d 1221, appear on its face to have any application to an officer's determination that a detained individual should be booked, rather than ticketed, in part because of his statements while detained.

[8] The majority recognizes that the officer was required to consider Ford's comments, but asserts, apparently as a factual matter, that Ford said nothing that would allow the officer to book him. *See* Majority at 10 n.1, 16–17. The officer, of course, thought otherwise. Thus, over five years after the event, the officer now faces liability because two appellate judges disagree with his assessment of the situation. This further illustrates the importance of requiring a showing of no probable cause. If, as the district

Because an officer's use of a detained person's statements raise substantially different considerations from an officer's reactions to the statements of a free person, the cases cited by the majority did not reasonably put the officers on notice that in telling Ford that he had talked himself into jail, they were chilling Ford's constitutionally protected right to free speech. If we are going to impose such etiquette upon peace officers, we must first clearly so hold, and not expect them to glean such a "vague" constitutional rule from Ninth Circuit cases that appear to be out of step, if not inconsistent, with recent Supreme Court decisions.[9]

## IV. Conclusion

In sum, we have wandered far from our limited role as an appellate court. First, we should have affirmed the district court because Ford has not shown that the court's determination that chilling his speech was not the "but for cause" of his booking. Second, we should have recognized that there is no "pre-existing law" that fairly informed the officers that they could not consider the statements Ford made while he was legally detained in deciding to book him,

---

court found, there was probable cause to book Ford, that should be the end of the matter.

[9] If nothing else, perhaps the majority's opinion and this dissent illustrate the wisdom of the Supreme Court's decision in *Pearson v. Callahan*, 555 U.S. 223 (2009), of allowing courts to address the second prong of the *Saucier* test when the constitutional question under the first prong is more difficult. Moreover, I fear that in failing to heed the Supreme Court's advice to "think carefully before expending scarce judicial resources to resolve difficult and novel questions of constitutional or statutory interpretation that will have no effect on the outcome of the case," *al-Kidd*, 131 S. Ct. at 2080 (internal quotation marks and citations omitted), we have demonstrated its wisdom.

and affirmed the district court pursuant to the second prong of the *Saucier* test. Finally, I disagree with the majority's assertion that Ford may assert a claim for retaliatory booking based on the statements he made while legally detained without showing an absence of probable cause for his booking. As in this case, police officers are often called upon to make decisions concerning the protection of themselves and the public on the street and in the middle of the night. We should not espouse a standard that may subject an officer to personal liability because years after the event a court decides that the officer may have had an improper motive – as well as probable cause – for the action he took. Accordingly, I dissent.